**SPRINGS VALLEY BANK & TRUST COMPANY, as trustee of the Kimball International, Inc. Employee Health Care Plan, Plaintiff–Counterdefendant,**

v.

**Dorothy A. CARPENTER, Defendant–Counterclaimant.**

**No. NA 91–94–C.**

United States District Court,
S.D. Indiana,
New Albany Division.

Oct. 21, 1993.

John R. Werner, Waldschmidt & Werner, Cannelton, IN and Gary Becker, Louisville, KY, for Dorothy Carpenter.

## ADOPTION OF MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

BROOKS, Chief Judge.

Having reviewed Magistrate Judge Kennard P. Foster's Report and Recommendation on the parties' cross motions for summary judgment in this Cause and having carefully considered the objections thereto, and being duly advised, the Court hereby approves and adopts the Report and Recommendation.

**SO ORDERED.**

## REPORT AND RECOMMENDATION ON PARTIES' CROSS MOTIONS FOR SUMMARY JUDGMENT.

FOSTER, United States Magistrate Judge.

Springs Valley Bank & Trust Company ("Springs Valley") brought this action under 28 U.S.C. §§ 2201 and 2202 for a declaratory judgment determining its obligation under the Kimball International, Inc. Employee Health Care Plan ("the Plan") and the Employee Retirement Income Security Act ("E.R.I.S.A."), 29 U.S.C. §§ 1001 *et seq.*, to pay health benefits to the defendant, Mrs. Dorothy A. Carpenter.[1] Mrs. Carpenter counterclaimed to recover benefits under the Plan (presumably pursuant to 29 U.S.C. § 1132(a)(1)(B)) and to recover common law damages for mental and physical suffering, intentional infliction of emotional distress, and punitive damages for Springs Valley's suspension of payments. Each party filed a motion for summary judgment which came before the undersigned Magistrate Judge, by designation of the Honorable Gene E. Brooks, District Judge, for the preparation of

S. Frank Mattox, Mattox & Mattox, New Albany, IN, Robert G. Stachler and Mark J. Ruehlmann, Taft Stettinius & Hollister, Cincinnati, OH, for Springs Valley Bank & Trust Co.

1. Springs Valley also contends that its declaratory action and the Court's jurisdiction arise under E.R.I.S.A. (Complaint ¶ 2, citing 29 U.S.C. § 1132). It would appear, however, that Springs Valley's declaratory action would be authorized only by § 1132(a)(3)(B)(ii) ("A civil action may be brought ... by a ... fiduciary ... to obtain other appropriate equitable relief ... to enforce any provision of this subchapter or the terms of the plan"), which is not exempt from § 1132(h)'s requirement that the Complaint be served by certified mail on the Secretaries of Labor and the Treasury. Although the plaintiff failed to comply with § 1132(h) (at least no evidence of such service was filed), its failure is not fatal because 28 U.S.C. §§ 2201 authorizes the declaratory action and the defendant failed to challenge the adequacy of service.

a report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B). This Court has jurisdiction over this cause under 28 U.S.C. § 1331 and 29 U.S.C. § 1132(e)(1) and (2). For the reasons set forth below, I recommend that each motion be granted in part and denied in part.

Summary judgment shall be rendered when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). "In determining whether a genuine issue of material fact exists, a trial court must view the record and all *reasonable* inferences drawn therefrom in the light most favorable to the non-moving party." *Renovitch v. Kaufman,* 905 F.2d 1040, 1044 (7th Cir.1990). " 'A party bearing the burden of proof on an issue may not simply rest on its pleadings, but must demonstrate that a genuine issue of material fact exists and requires trial.' " *Stewart v. McGinnis,* 5 F.3d 1031, 1033 (7th Cir.1993) (*quoting Jamison–Bey v. Thieret,* 867 F.2d 1046, 1047 (7th Cir.1989)); *see also Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 256–57, 106 S.Ct. 2505, 2514, 91 L.Ed.2d 202 (1986) ("the plaintiff must present affirmative evidence in order to defeat a properly supported motion for summary judgment"). Following the Supreme Court's declaration that "[o]ne of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses, and we think it should be interpreted in a way that allows it to accomplish this purpose," *Celotex Corp. v. Catrett,* 477 U.S. 317, 323–24, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986), the Seventh Circuit has held that "[r]equiring [a] district court to take totally unsupported allegations as true would clearly impede the utility of having a summary judgment rule." *Stewart v. McGinnis,* at 1034.

### Background.

The parties do not dispute the following facts. On May 28, 1990, Mrs. Carpenter was injured in a one-car accident near Owensboro, Kentucky. She was a passenger in the car which was driven by her husband, Michael Carpenter, and owned by Bryan Kellams, her brother. Michael Carpenter's negligence caused the accident. Michael Carpenter is employed by Kimball International, Inc. ("Kimball"), of Jasper, Indiana, which maintains an E.R.I.S.A.-qualified employee health benefits plan. Springs Valley, also of Jasper, is the trustee and claims processor for the Plan and Kimball is the plan administrator. As the spouse of a Kimball employee, Mrs. Carpenter is covered by the Plan. After paying approximately $6,000 of Mrs. Carpenter's medical and hospital expenses resulting from the accident, Springs Valley suspended further payments.[2] Some time after the accident, Mrs. Carpenter received $10,000 in no-fault benefits from the Economy Fire and Casualty Company ("Economy"), Mr. Kellams' insurer,[3] and $25,000 in

---

2. Springs Valley claims it paid $6,573.23 to Mrs. Carpenter before the suspension. Complaint ¶ 12 (denied in defendant's Answer); Eckstein deposition, p. 17. Mrs. Carpenter offered no allegation on the exact amount of benefits she received. Springs Valley stated that $36,933.41 of expenses are pending on Mrs. Carpenter's record. Complaint ¶ 12; Eckstein Deposition at 18. A finding of the exact figures is not essential to determine the present motions.

3. The source and basis of this $10,000 payment was somewhat uncertain on the pleadings and memoranda. Springs Valley stated it was a settlement from a third party, Complaint ¶ 13 (denied in Mrs. Carpenter's answer); (Plaintiff's Memorandum in Opposition, p. 1), and later stated that "Defendant's attorney did acknowledge payment of $10,000.00 from the insurance company for the automobile owner," (Plaintiff's Memorandum in Support, p. 4; see also pp. 8–9).

On the other hand, Mrs. Carpenter identified this payment only as "$10,000 in no-fault benefits," (Defendant's Memorandum in Support, p. 2), and later asserted that "the $10,000 payment to defendant is not from a third party. This payment represents first-party no-fault benefits. By its very definition such a payment is not from a third party," (Defendant's Memorandum in Opposition, p. 12).

The only facts or evidence presented on this question came from representatives of Springs Valley. Gail Neuhoff, one of Springs Valley's claims processors, stated in her affidavit that Mrs. Carpenter's husband sent her a note identifying Dale State Agency as Bryan Kellam's insurer. Neuhoff Affidavit ¶ 9, p. 4 and Exhibit D; see also Eckstein deposition, Exhibit 1. Then, after learning from one of Mrs. Carpenter's providers that "Dale State Agency" paid Mrs. Carpenter's bill, Mrs. Neuhoff contacted the Dale State Agen-

benefits from American Family Insurance Company ("American Family"), her husband's liability carrier.[4]

Springs Valley claims it suspended payments to Mrs. Carpenter because she failed to fulfill her obligation under the Plan to cooperate. It claims that Mrs. Carpenter never informed it of the $35,000 in payments from Economy and American Family, she still refuses to provide documentation of these recoveries, she has not executed a subrogation agreement, she refuses to agree not to prejudice the Plan's subrogation rights, and she refuses to repay the Plan for the benefits it has already paid to her. Springs Valley seeks a judgment declaring that its suspension of benefits is lawful under the Plan. To do so, the Court must find that (1) Mrs. Carpenter is obligated to supply certain information to the Plan before receiving benefits and has failed to do so, (2) Mrs. Carpenter is obligated to execute a subrogation agreement in favor of the Plan before receiving benefits and has failed to do so, and (3) the Plan is entitled to demand reimbursement of the approximately $6,000 of benefits already paid before making further payments. Mrs. Carpenter contends that (1) she did not fail to cooperate, (2) the Plan is not entitled to suspend payments because of a beneficiary's failure to cooperate, (3) the Plan is not entitled to reimbursements before making additional payments, (4) the Plan has no subrogation rights to the $35,000 Mrs. Carpenter received from Economy or American Family, and (5) the Plan is only entitled to a *pro rata* reimbursement from Mrs. Carpenter's recoveries if she is not made whole.

Standard of Review.

■■■ An E.R.I.S.A. plan trustee's actions are reviewed *de novo* unless the plan grants the trustee discretionary power to construe the plan's terms, in which case the trustee's actions will be upheld unless arbitrary or capricious. *Firestone Tire & Rubber Co. v. Bruch,* 489 U.S. 101, 117, 109 S.Ct. 948, 958, 103 L.Ed.2d 80 (1989). In this case, the Plan's policy grants the trustee such discretion:

> The Plan Administrator shall have authority to interpret the provisions of the Plan and establish rules for the administration of the Plan. Unless arbitrary or capricious, the Plan Administrator's interpretation of any provisions of the Plan shall be binding and conclusive on all persons.

cy and was informed that Katherine Smith of Economy Fire and Casualty was the adjuster on Mrs. Carpenter's claims. *Id.* ¶ 14, p. 5. Attached to the deposition transcript of Shelley Eckstein, one of Springs Valley's claims processors, is a copy of a March 13, 1991 letter from Mrs. Carpenter's attorney to Springs Valley informing it that Economy Fire and Casualty's denied Mrs. Carpenter's claim. Eckstein deposition, Exhibit 1. The attached February 20, 1991 letter from Kathryn M. Smith to Mrs. Carpenter's attorney states that Mrs. Carpenter's claim would be honored only to the extent of "the $10,000 pip limits" because Indiana Law barred any claim by Mrs. Carpenter against her husband or brother. *Id..* This letter identifies "Our Insured: Kellems, Bryan K"; May 28, 1990 as the date of loss; and lists the Dale State Agency. *Id..* Shelley Eckstein averred that she twice contacted Kathryn Smith at Economy Fire and Casualty and received information regarding its payment of $10,000 to Mrs. Carpenter. Eckstein Affidavit, ¶¶ 7 and 8, pp. 3–4 and Exhibit C; Eckstein deposition, Exhibit 1 (November 8, 1990 letter from Eckstein to defendant's attorney). Springs Valley does not mention any other $10,000 payment.

Mrs. Carpenter did not identify the carrier or provide any other details of the $10,000 payment and she submitted no evidence identifying the $10,000 payment. She did not even deny Springs Valley's repeated characterizations of the payment or the supporting evidence. Unsupported allegations cannot defeat motions for summary judgment supported by credible evidence. We assume, therefore, for the purposes of these motions, that the $10,000 payment to Mrs. Carpenter was made by Bryan Kellam's insurance carrier in satisfaction of Kentucky's no-fault insurance requirements. If there was another $10,000 payment to Mrs. Carpenter, it is not mentioned by Springs Valley and does not figure into the Court's rulings.

4. These payments to Mrs. Carpenter are not necessarily exclusive. While Mrs. Carpenter admits receiving these amounts, she does not allege, admit, or prove that they constitute all the payments she received on account of the accident or all the payments she received from these two sources.

Policy, § 9.01.[5] *See Cutting v. Jerome Foods, Inc.,* 993 F.2d 1293, 1295 (7th Cir. 1993) (similar provision warrants arbitrary and capricious review). While the parties dispute whether the level of deference under the arbitrary and capricious standard should be "reasonableness" or "abuse of discretion," *see Lister v. Stark,* 942 F.2d 1183, 1187–88 (7th Cir.1991); *Loyola University of Chicago v. Humana Insurance Co.,* 996 F.2d 895, 898 n. 1 (7th Cir.1993), we adhere to the view that there is insignificant, if any, difference between the two and that the standard is best defined as simply one of reasonableness. *Loyola University,* 996 F.2d at 898 ("Under the arbitrary and capricious standard, a denial of benefits will not be set aside if the denial was based upon a reasonable interpretation of the plan documents"); *Cutting,* 993 F.2d at 1295–96 (defining the standard by such "possibly synonymous" terms as arbitrary and capricious, abuse of discretion, and clear error, and holding that courts should overturn actions "only if persuaded that the administrator acted unreasonably"); *Russo v. Health, Welfare & Pension Fund,* 984 F.2d 762, 765 (7th Cir.1993) ("judicial review is limited to whether [trustees'] decision was arbitrary and capricious.... In other words, as long as the Trustees' decision was based on a reasonable interpretation of the plan's language and the evidence in the case, we will not disturb it"); *Hammond v. Fidelity and Guaranty Life Insurance Co.,* 965 F.2d 428, 429 (7th Cir.1992) ("we simply defer to the trustee's interpretation, assuming it's reasonable"); *Lister,* 942 F.2d at 1188;[6] *Jones v. Iron Workers District Council of Southern Ohio,* 829 F.Supp. 268, 270 (S.D.Ind.1993). Therefore, we will uphold

Springs Valley's interpretations and applications of the Plan unless persuaded that they are unreasonable.[7]

### Analysis.

#### A. *Summary plan description vs. plan policy.*

■ The initial issue is which Plan provisions governed Springs Valley's actions. An employee benefit plan under E.R.I.S.A. consists of the plan policy, or written instrument, 29 U.S.C. § 1102, and the summary plan description. Every plan is required to supply participants and beneficiaries with an understandable summary plan description ("S.P.D.") which is "sufficiently accurate and comprehensive to reasonably apprise such participants and beneficiaries of their rights and obligations under the plan." 29 U.S.C. §§ 1021(a)(1), 1022(a)(1), and 1024(b). The question is which document controls when an S.P.D. conflicts with a plan policy.

The S.P.D. supplied to participants of Kimball's Plan[8] included the following subrogation language:

SUBROGATION

When Major Medical Benefits are paid under this Plan for expenses that were the result of what is alleged to be the negligence of another person, the Plan has the right to be reimbursed from any recovery you obtain from the other person for the alleged negligence. The Plan is entitled to a reimbursement from any recovery even if it does not fully satisfy the judgment, settlement or underlying claim for damages or fully compensate you for your injury. If you do not fully recover the value of

---

**5.** The Plan's policy document ("Policy") is Exhibit B to the Complaint and Exhibit A to the affidavit of Phyllis Ashburn.

**6.** "We are sympathetic to this unwillingness to split semantic hairs. Because the central issue before us is the construction of a disputed term in the Plan, we believe the district court took an appropriate course when it applied the standard found in the dicta from *Firestone:* 'A trustee may be given power to construe disputed or doubtful terms, and in such circumstances the trustee's interpretation will not be disturbed if reasonable.' 489 U.S. at 111, 109 S.Ct. at 954." *Lister,* 942 F.2d at 1188.

**7.** The reasonableness standard also includes a good faith requirement. *Allison v. Dugan,* 951 F.2d 828, 833 (7th Cir.1992). In her complaint, Mrs. Carpenter sought punitive damages, but she offered no specific allegation, argument, or proof that Springs Valley acted in bad faith.

**8.** Kimball supplied its employees with an "Employee Handbook" from which the following subrogation language was taken. Eckstein deposition, pp. 12–13, 30–33, and Exhibit 2; Ashburn deposition, p. 13 ff.. Because both parties assume that this Handbook constituted the Plan's S.P.D., we do as well.

your claim, the Plan will be reimbursed on a pro-rata basis.

The Plan may take whatever legal action it sees fit against the third party to recover benefits paid under this policy. Our exercise of this right does not affect your right to pursue other forms of recovery. The Plan has the right to your full cooperation in any case involving the alleged negligence of a third party. No payment of Major Medical Benefits need be made by the Plan until a subrogation agreement has been signed and filed with the Claims Processor.

Eckstein deposition, Exhibit 2. Kimball's Policy, by contrast, contains the following provision:

In the event any benefits or services of any kind are furnished to an Eligible Employee or covered Dependent, or a payment is made or credit is extended to or on behalf of any Eligible Employee or covered Dependent for an illness or injury caused by a third party or for which such third party may be liable, the Plan shall be subrogated and shall succeed to the individual rights of recovery against any such third party to the full extent of the value of any such benefits or services furnished or payments made or credit extended. The Eligible Employee or covered Dependent shall, at the Plan's request, take such action, furnish such information and assistance, and execute such documents as the Plan may require to facilitate enforcement of its rights hereunder. In the event of the Eligible Employee's or covered Dependent's failure to comply with any such request, the Plan shall be entitled to withhold benefits, services, payments or credits due under the Plan. The Eligible Employee or covered Dependent shall do nothing after acceptance of benefits hereunder to prejudice the subrogation rights of the Plan.

Policy, § 8.03. We must decide which provision applies.

Mrs. Carpenter cites several Courts of Appeals decisions in support of her argument that E.R.I.S.A.'s objective that S.P.D.s contain accurate and comprehensive summaries of policies requires that the terms of an S.P.D. prevail over policy terms in cases of conflict. *McKnight v. Southern Life & Health Insurance Co.*, 758 F.2d 1566 (11th Cir.1985); *Brown v. Blue Cross & Blue Shield of Alabama*, 898 F.2d 1556 (11th Cir. 1990); *Heidgerd v. Olin Corp.*, 906 F.2d 903 (2nd Cir.1990); *Hansen v. Continental Insurance Co.*, 940 F.2d 971 (5th Cir.1991); *Edwards v. State Farm Mutual Automobile Insurance Co.*, 851 F.2d 134 (6th Cir.1988). Springs Valley argues that controlling Seventh Circuit authority in *Kolentus v. Avco Corp.*, 798 F.2d 949 (7th Cir.1986) (affirming a decision from this district), *cert. denied*, 479 U.S. 1032, 107 S.Ct. 878, 93 L.Ed.2d 832 (1987), requires that a plan policy control over an S.P.D. when the S.P.D. contains a disclaimer giving precedence to the terms in the policy.[9] *Kolentus* analyzed the question as one of promissory estoppel:

To sustain a claim for promissory estoppel, the plaintiff must establish (1) a clear and unambiguous promise by the defendant-promisor; (2) which induced reasonable and foreseeable reliance by the plaintiff-promisee; and (3) which resulted in injury to the plaintiff. The plaintiff's asserted reliance on the summary booklets is neither reasonable nor foreseeable in light of the express admonition prefacing each of the booklets. Thus, we conclude that the plaintiffs cannot avail themselves of the doctrine of promissory estoppel.

We agree with the courts in *Anthony v. Ryder Truck Lines, Inc.*, 466 F.Supp. 1287, 1292–94 (E.D.Pa.), *rev'd on other grounds*, 611 F.2d 944 (3d Cir.1979), and *Churchwell v. Firestone Industrial Products Co.*, 431

**9.** Springs Valley notes that *Kolentus* was cited with approval by the Fourth Circuit in *de Nobel v. Vitro Corp.*, 885 F.2d 1180, 1195 (4th Cir. 1989). Although a later Fourth Circuit case cited *de Nobel* as indicative of the Circuit's reluctance to give precedence to S.P.D.s in the presence of disclaimers, *DeWitt v. State Farm Ins. Companies Ret. Plan*, 905 F.2d 798, 802 n. * (4th

Cir.1990), the Circuit clearly abandoned this reluctance later, *see Glocker v. W.R. Grace & Co.*, 974 F.2d 540 (4th Cir.1992) (discussed in the text *infra* ) and classified *de Nobel's* statement as "mere dictum," *Pierce v. Security Trust Life Insurance Company*, No. 90–1101, Unpublished Table Case, 966 F.2d 1443, 1992 WL 150177 (4th Cir.1992).

N.E.2d 853, 855 (Ind.Ct.App.1982), that when the summary booklet expressly states that it is merely an outline of the pension plan and that the formal text of the plan governs in the event a question arises, the plaintiffs cannot rely on the general statements of the booklet but must look to the plan itself. *See also Van Orman v. American Ins. Co.*, 680 F.2d 301, 307 (3d Cir.1982); *Voight [Voigt] v. South Side Laundry & Dry Cleaners, Inc.*, 24 Wis.2d 114, 118, 128 N.W.2d 411 (1964).

*Kolentus*, 798 F.2d at 958. Kimball's S.P.D. contained the following prefatory statement, which Springs Valley contends is indistinguishable from the disclaimer found effective in *Kolentus* and thus requires an identical result:

> This booklet is intended to explain the benefits provided by Kimball International, Inc. Employee Benefit Plans. Your rights and benefits are determined in accordance with the provisions of the Plans, and your coverages are effective only if you are eligible for coverage and become and remain covered in accordance with their terms. The Plan documents are in the possession of the Company and may be inspected and copies obtained at any reasonable time.

(Plaintiff's Memorandum in Opposition, p. 8).[10] Further, Springs Valley argues that, even without this Seventh Circuit precedent, the cases cited by Mrs. Carpenter require that plan beneficiaries reasonably relied to their detriment on the S.P.D., and a disclaimer necessarily renders any such reliance unreasonable. Mrs. Carpenter argues that *Kolentus* is not controlling authority because it was decided on the basis of state law, not E.R.I.S.A., and she points to the Court's later opinion in *Fuller v. CBT Corp.*, 905 F.2d 1055, 1060 (7th Cir.1990) (*citing Edwards* ) which stated that "[i]n the event of a conflict between handbook and plan, the former may trump—clearly so, when it is the employee relying on the handbook, for it is hardly realistic to expect him to read further." Springs Valley denies contends that only an irrelevant part of *Kolentus* was based on state law and argues that the passage from *Fuller* is only *dicta.*

The Court must agree with Mrs. Carpenter that *Kolentus* was based on state law, not E.R.I.S.A., as indicated in the margin,[11] but we must also agree with Springs Valley that *Fuller* does not control: its statement was *dicta* because the Court found no conflict between the S.P.D. and the policy document, it set forth no criteria for determining when an S.P.D. "may trump" a policy, and it did

---

10. Springs Valley cited the S.P.D. as Exhibit B to the Ashburn affidavit. No such exhibit is attached to the affidavit submitted to the Court and the affidavit does not refer to such an exhibit. Only this one page of the S.P.D. was submitted to the Court.

11. Although the present appeal concerns the management and termination of certain employee benefit plans, it is not governed by the provisions of ERISA. In its decision of October 11, 1983, the district court considered whether ERISA preempted the plaintiffs' state law claims. Based on the assumption that the four pension plans at issue all were terminated prior to September 2, 1974, when ERISA was signed into law, the district court concluded that the plaintiffs' state law claims were not preempted. *See* 29 U.S.C. § 1133 (effective January 1, 1975, ERISA preempts state laws relating to employee benefit plans covered by the federal act). While three of the four plans were terminated two days prior to the enactment of ERISA, it is clear from the record that the Guards plan was not terminated until May 31, 1975. The district court incorrectly stated that this latter plan was terminated on May 31, 1974.

The question of the applicability of ERISA to the termination of the Guards pension plan, however, is not raised on appeal. Accordingly, this court will assume without deciding that the plaintiffs' claims as to the termination of this plan are governed by state law. *Kolentus*, 798 F.2d at 954. We must also reject Springs Valley's contention that the *Kolentus* Court's citations indicate that its decision was based on the law of E.R.I.S.A. because the cases cited applied state law or common law principles. *Van Orman*, 680 F.2d at 306 ("Although plaintiffs' integration claim rests exclusively on state law, neither the district court nor the parties considered whether it is preempted by ERISA.... Because of our disposition of this issue, we may assume, without deciding, that New Jersey law controls"), at 308 ("We again assume, without deciding, that New Jersey law controls"); *Anthony, supra* (no mention of E.R.I.S.A., principles of contract interpretation and estoppel applied); *Churchwell, supra* (same); *Voigt, supra* (decided in 1964, long before E.R.I.S.A.'s effective date).

not discuss the effect of S.P.D. disclaimers. The law in the Seventh Circuit has undergone significant development since the parties briefed these cases.

■ Although some of the cases preferring S.P.D.s employ the language of estoppel,[12] the Court finds that equitable estoppel[13] is an inappropriate standard to govern the priority of S.P.D.s and plan policies. Equitable estoppel is generally available in all legal actions and has been applied in limited circumstances in E.R.I.S.A. cases, *Black v. TIC Investment Corp.,* 900 F.2d 112, 115 (7th Cir.1990) (equitable estoppel may apply to informal representations regarding unfunded, single-employer welfare benefit plans); *Russo,* 984 F.2d at 767 text and n. 4, but there is reluctance to apply estoppel generally in E.R.I.S.A. cases because of the fear that it would conflict with E.R.I.S.A.'s substantive objectives of, *inter alia,* preserving the actuarial soundness of plan funds and requiring all governing terms to be in writing, *Cutting,* 993 F.2d at 1297; *Schoonmaker v. Employee Savings Plan,* 987 F.2d 410, 413 (7th Cir. 1993); *Russo,* 984 F.2d at 767; *Rodrigue v. Western and Southern Life Insurance Co.,* 948 F.2d 969, 971–72 (5th Cir.1991); *Black,* 900 F.2d at 115. The Court did not discover (and the parties did not submit) a controlling opinion from the Seventh Circuit Court of Appeals directly addressing the applicability of estoppel principles to the question of the priority of S.P.D.s and plan policies.

E.R.I.S.A.'s substantive objective of promoting ease of access by participants to understandable information on plan provisions through requiring plans to disseminate accurate and comprehensive summary plan descriptions would be thwarted by applying the principles of equitable estoppel, including detrimental reliance, to resolve conflicts between summary plan descriptions and plan policies. The majority of cases recognize that for E.R.I.S.A.'s requirement of accurate and comprehensive S.P.D.s to have any effect at all, participants must be entitled to rely on an S.D.P.'s terms over a plan policy in the event of a conflict between the two. In support of its holding that "[t]he insured is protected by the fact that, in the event of a discrepancy between the coverage promised in the summary plan document and that actually provided in the policy, he is entitled to claim the former," the Seventh Circuit in *Senkier,* 948 F.2d at 1051, cited the Fifth Circuit's opinion in *Hansen* which said:

> ERISA requires, in no uncertain terms, that the summary plan description be "accurate" and "sufficiently comprehensive to reasonably apprise" plan participants of their rights and obligations under the plan. 29 U.S.C. § 1022. The rule that Continental urges [preferring the policy in cases of ambiguity or conflict] would eviscerate this requirement. Under Continental's proposed rule the summary would not need to be accurate or comprehensive—if there were an ambiguity in the summary or an

12. *See, e.g., Senkier v. Hartford Life & Accident Insurance Co.,* 948 F.2d 1050, 1051 (7th Cir. 1991) ("This requirement [that S.P.D.s be accurate and comprehensive] entitles the participant to rely on the summary plan document, and if he does the plan is estopped to deny coverage"); *McKnight,* 758 F.2d at 1570 ("Unfairness will flow to the employee for reasonably relying on the summary booklet"); *Bachelder v. Communications Satellite Corp.,* 837 F.2d 519, 523 (1st Cir.1988); *Govoni v. Bricklayers, Masons & Plasterers,* 732 F.2d 250 (1st Cir.1984); *Genter v. Acme Scale & Supply Co.,* 776 F.2d 1180 (3rd Cir.1985); *Gors v. Venoy Palmer Market, Inc.,* 578 F.Supp. 365 (E.D.Mich.1984).

The nature of the reliance required in the case law is not often addressed, but some of the cases appear to contemplate a relaxed form of reliance, not the detrimental or prejudicial reliance usually associated with the traditional doctrine of equitable estoppel. *See Senkier, supra* (court states plans are estopped if participants rely on

terms of S.P.D., yet opinion does not examine the facts for reliance and case involved benefits for sudden death of plan participant); *Hansen v. Continental Insurance Co.,* 940 F.2d 971, 983 (5th Cir.1991) (court found sufficient reliance in participant's affidavit stating that "he read the plan summary, including the paragraph in question, and understood it to mean that his wife was insured for 60% of his principal amount").

13. " 'An estoppel arises when one party has made a misleading representation to another party and the other has reasonably relied to his detriment on that representation.' " *Russo v. Health, Welfare & Pension Fund,* 984 F.2d 762, 768 (7th Cir.1993) (*quoting Black v. TIC Investment Corp.,* 900 F.2d 112, 115 (7th Cir.1990), *citing Heckler v. Community Health Services, Inc.,* 467 U.S. 51, 59, 104 S.Ct. 2218, 2223, 81 L.Ed.2d 42 (1984)).

inaccuracy that put the summary in conflict with the policy, that ambiguity or inaccuracy would be cured by the policy itself. The result would be that before a participant in the plan could make any use of the summary, she would have to compare the summary to the policy to make sure that the summary was unambiguous, accurate, and not in conflict with the policy. Of course, if a participant has to read and understand the policy in order to make use of the summary, then the summary is of no use at all.

\* \* \* \* \* \*

Like the Sixth and Eleventh Circuits, this Court holds that the summary plan description is binding, and that if there is a conflict between the summary plan description and the terms of the policy, the summary plan description shall govern. Any other rule would be, as the Congress recognized, grossly unfair to employees and would undermine ERISA's requirement of an accurate and comprehensive summary.

*Hansen,* 940 F.2d at 981–82. *Senkier* also cited the Eleventh Circuit's decision in *McKnight,* 758 F.2d at 1570 ("... Southern Life asserts that if a conflict arose between the plan and the summary, the plan should prevail. Such an assertion defeats the purpose of the summary. It is of no effect to publish and distribute a plan summary booklet designed to simplify and explain a volumi-

nous and complex document, and then proclaim that any inconsistencies will be governed by the plan. Unfairness will flow to the employee for reasonably relying on the summary booklet"), and the Sixth Circuit's decision in *Edwards,* 851 F.2d at 137, which quoted *McKnight. See also Herrmann v. Cencom Cable Associates, Inc.,* 978 F.2d 978, 983 (7th Cir.1992) ("a summary plan description ... prevails over the plan itself in the event of a conflict") (*citing Senkier*); *Heidgerd v. Olin Corp.,* 906 F.2d 903, 907–08 (2nd Cir.1990).[14] Under this view, disclaimers are ineffective to defeat participants' reliance on the terms of a S.P.D.:

To give effect to such a disclaimer would wholly undermine the rule that the statements of the summary plan description are binding. Indeed, if the insurer could escape the binding effect of the summary simply by adding a disclaimer to the summary, the insurer could escape the requirement of an accurate and comprehensive summary plan description. Accordingly, this Court holds, as a necessary corollary to its holding that the statements in the summary plan description are binding, that drafters of a summary plan description may not disclaim its binding nature.

*Hansen,* 940 F.2d at 982 (cited with approval in *Senkier,* 948 F.2d at 1051). With the ineffectiveness of disclaimers declared, estoppel's requirement of detrimental reliance is also significantly weakened if not eliminated. Although *Hansen* may have formally left

---

14. *Kreutzer v. A.O. Smith Corp.,* 951 F.2d 739 (7th Cir.1991) should not be understood to the contrary. In that case, the plan distributed handbooks to the company's supervisors. Though the handbooks were updated periodically, the section on termination benefits was not changed to reflect a reduction in benefits. Six years later, the handbooks were replaced with new manuals which were silent regarding termination and other benefits. Although new manuals were issued and a memo was circulated recalling the old handbooks, many remained in the workplace. Certain supervisors who were separated eleven years after the new manuals were issued sued for a recomputation of their termination benefits under the prior formula reflected in the old handbooks. The Court held that the new formula in the plan's policy document controlled over the handbook's formula, but it did not do so by choosing priority between an S.P.D. and the plan's policy. The terminated supervisors did not argue that the old handbooks consti-

tuted a summary plan description and the Court described the situation as a failure by the plan to disclose the new termination formula in an S.P.D.; there was no valid S.P.D. in the case. The Court's focus was on the appropriate remedy for such procedural violations of E.R.I.S.A. by a plan. It held that monetary relief for such procedural violations could be awarded only if the plan "acted in bad faith, actively concealed the benefit plan, or otherwise prejudiced their employees by inducing their reliance on a faulty plan summary." *Id.* at 743. The Court found no bad faith or active concealment. It further found no prejudice or reasonable reliance by the supervisors—equitable estoppel principles—because the plan informed them that the handbooks were revoked, it inform them where to find the current provisions, it made the plan policy readily available, and the absence of any information in the manuals as to other benefits they enjoyed should have alerted the supervisors to the need to consult the policy document.

open the possibility of a reliance requirement, *id.* at 983, it is unlikely that such reliance would be the same as under traditional equitable estoppel. Indeed, the Fifth Circuit said it could avoid the issue of a reliance requirement in *Hansen* because it found that the participant presented ample evidence of reliance in having merely read and understood the S.P.D.. *Id.;* see note 12.

A line of recent cases approaches the question of priority between S.P.D.s and policies also through principles of contract interpretation. These cases apply the principle of *contra proferentem:* in cases of conflict between a summary plan description and a policy, the terms which favor the participant will govern. *See Sturges v. Hy–Vee Employee Benefit Plan and Trust,* 991 F.2d 479, 480–81 (8th Cir.1993); *Glocker v. W.R. Grace & Co.,* 974 F.2d 540, 542–43 (4th Cir.1992); *McGee v. Equicor–Equitable HCA Corp.,* 953 F.2d 1192, 1201 (10th Cir.1992); *Sanders v. Scheideler,* 816 F.Supp. 1338, 1344 (W.D.Wis. 1993). The Fourth Circuit's reasoning is persuasive:

> Grace, having represented to its employees that the Plan—not the handbook— governed questions about benefits, cannot now repudiate this representation and rely on statements in the handbook that are less favorable to Mrs. Glocker. In *McGee v. Equicor–Equitable HCA Corp.,* ... the court applied the same reasoning where the provision in the plan benefited the beneficiary rather than the employer, concluding that the plan "by operation of Equicor's own disclaimer" controls. The disclaimer, to which the *McGee* court referred, was similar to Grace's. It, too, provided that the plan—not the handbook—controls.
>
> This is not to say that in every case the plan prevails when there is a disclaimer in the handbook. In *Pierce v. Security Trust Life Ins. Co.,* [979] F.2d [23] (4th Cir.1992), citing 29 U.S.C. § 1022, legislative history, and abundant precedent, we held that employees can rely on the handbook—or, as it

is frequently called, the Summary Plan Description (SPD)—despite a disclaimer in the handbook (or SPD) that ostensibly designates the Plan, with its different provisions, as the primary document. *Pierce,* [979] F.2d at [26–27]. The distinction between this case and *Pierce* is this: in this case, where the handbook favors the employer, the employer cannot disavow a disclaimer in the handbook representing that the Plan controls; in *Pierce,* where the Plan favors the employer, the employer cannot invoke the Plan by relying on a disclaimer in the handbook that, contrary to the intent of Congress, designates the Plan as the controlling document.

*Glocker,* 974 F.2d at 542–43 (citations omitted). *See also Hansen:*

> Our conclusion [that the terms of a S.P.D. should control over conflicting policy terms] draws support from other quarters as well. In contracts of insurance generally, ambiguities are resolved against the drafter. The same rule should apply here; the ambiguity in the summary plan description must be resolved in favor of the employee and made binding against the drafter. Any burden of uncertainty created by careless or inaccurate drafting of the summary must be placed on those who do the drafting, and who are most able to bear that burden, and not on the individual employee, who is powerless to affect the drafting of the summary or the policy and ill equipped to bear the financial hardship that might result from a misleading or confusing document. Accuracy is not a lot to ask. And it is especially not a lot to ask in return for the protection afforded by ERISA's preemption of state law causes of action—causes of action which threaten considerably greater liability than that allowed by ERISA.

940 F.2d at 982 (citations omitted) (cited with approval in *Senkier* ).[15] This approach is persuasive and we adopt it.

---

**15.** Although *contra proferentem* is traditionally a tool of contract interpretation, it is important to note that the task in which it is applied here is one of construction, not interpretation. When determining whether an S.P.D. or policy term

governs, courts are not interpreting the meaning of ambiguous terms or reconciling conflicting terms in a document, as in contract law. Utilization of *contra proferentem* in that case would violate the limits of judicial review because the

■ We hold that when terms of an S.P.D. and policy conflict, the terms which favor the participant will govern, regardless of disclaimers (read or unread) or detrimental reliance. While we hold that detrimental reliance is not required, we need not decide whether a lesser level of reliance is required because, as in *Hansen,* there is sufficient reliance in this case: (1) the filings establish that the defendant knew and understood the S.P.D. subrogation language; (2) one of Springs Valley's claims processors admitted that, after the claims for Mrs. Carpenter's accident began to arrive, she sent a copy of the S.P.D. subrogation section to Mrs. Carpenter as a representation of the Plan's subrogation rights and her responsibilities thereunder, Eckstein deposition, p. 12–13, 32–33; (3) there is no evidence that anyone from the Plan sent Mrs. Carpenter the Policy term on subrogation at this time or informed her of its provisions; and (4) Phyllis Ashburn, who is Director of Health Care Benefits for Kimball (she was employed by and reported to Kimball but supervised Springs Valley's staff of claims processors who administered Kimball's Plan), was unaware until the day before her deposition that there was a discrepancy between the Policy and the S.P.D., Ashburn deposition, p. 14–19. Although Springs Valley argued that neither Mr. nor Mrs. Carpenter ever relied on the S.P.D. and cited their depositions, (Plaintiff's Memorandum in Opposition, p. 8 n. 4), the argument is ineffective because these depositions were not submitted to the Court.

The Court finds that the subrogation term in the Plan's Employee Handbook governs over § 8.03 of the Plan Policy.

### B. *The Plan's subrogation rights to the $10,000 and $25,000.*

■ Is Springs Valley's decision that it is subrogated to Mrs. Carpenter's $10,000 no-fault recovery from the car owner's insurer and $25,000 recovery from the driver's liability insurer reasonable under the S.P.D. subrogation clause? The answer bears on the ultimate question of whether Springs Valley

acted reasonably in suspending benefits to Mrs. Carpenter. Mrs. Carpenter argues that the $10,000 payment is a first-party payment, not one from a third-party, and is therefore not reimbursable. She also argues that the Plan has no rights to the $25,000 from her husband's liability carrier because her husband is a Plan participant and a plan cannot be subrogated to payments from one of its own insureds.

The S.P.D. provides, in pertinent part, that "When Major Medical Benefits are paid under this Plan for expenses that were the result of what is alleged to be the negligence of another person, the Plan has the right to be reimbursed from any recovery you obtain from the other person for the alleged negligence." Unlike the Policy, which arguably permits subrogation to amounts recovered from persons whose negligence did not *cause* the injury but who might be legally *liable* or responsible to make payments because of the injury (*e.g.,* first-person liability carriers and others under a contractual obligation to pay for injuries), it would be unreasonable to interpret the S.P.D. as permitting subrogation to recoveries from anyone other than the negligent tortfeasor because "the other person" from whom the participant recovers in the S.P.D. clearly refers only to the "negligence of another person" that caused the injury. In this case, the parties agree that the accident that injured Mrs. Carpenter was caused by the negligence of Mr. Carpenter, the driver. Thus, the Plan is reasonably subrogated to the $25,000 liability payment from Mr. Carpenter's insurer and Springs Valley is entitled to a judgment declaring so as a matter of law.

■ Mrs. Carpenter supports her argument that the Plan cannot be subrogated to amounts recovered from its own insureds by citations to common law insurance principles. Courts cannot override a Plan's unambiguous terms by applying federal common law, and here the S.P.D. clearly grants the Plan subrogation rights to any amounts a participant recovers from a tortfeasor. At any rate,

plan has the discretion to interpret ambiguous or conflicting terms and courts may overturn those interpretations only if unreasonable. Instead, these courts use the principle of *contra proferen-*

*tem* to determine what the operative plan, document, or "contract" is to begin with—then questions of interpretation follow.

even with the tortfeasor being another insured, the $25,000 recovery did not originate from Plan funds paid to Mr. Carpenter, but came from a third-party liability carrier.

■ There is a genuine question of fact as to whether the owner of the car, Bryan Kellams, was also a negligent cause of the accident. As indicated, the Plan is subrogated to his $10,000 payment only if he was. In its Complaint, Springs Valley alleged:

> Upon information and belief, and based upon the statements and representations of Defendant and her attorneys, third parties, including but not limited to the driver of the vehicle, Michael Carpenter, and the owner of the vehicle, Bryan Kellams, were the cause of Defendant's injuries or may be liable to Defendant for her injuries.

Complaint ¶ 10. Springs Valley did not offer any further argument or evident on Bryan Kellams' negligence (undoubtedly because the Policy does not require such a showing) and Mrs. Carpenter's arguments were restricted to asserting that the $10,000 payment from Mr. Kellams' insurer was a first-party, not a third-party, payment (also relevant only under the Policy). Economy Fire & Casualty, Mr. Kellams' insurer, refused to pay any additional amounts on the policy, not because it was established or conceded that he wasn't negligent, but because it believed that Indiana law prevented Mrs. Carpenter from suing her husband, the driver, and Mr. Kellams, her brother, the owner. The issue was simply not addressed by the parties. Therefore, because the Complaint suggests Mr. Kellams' negligence, the fact is dispositive of an important issue, such a fact would not be inconsistent with any other presented facts, Mrs. Carpenter did not dispute or concede Mr. Kellams' negligence, and there is no evidence on the matter, we find that there is a genuine issue of material fact regarding whether any of Mrs. Carpenter's expenses were the result of Mr. Kellams' negligence. Springs Valley is not entitled to judgment as a matter of law that the Plan is subrogated to Mrs. Carpenter's $10,000 recovery from Mr. Kellams.

### C. Extent of the Plan's subrogation rights.

■ Springs Valley argues that it is subrogated to the full extent of benefits paid to Mrs. Carpenter while she argues that the Plan is subrogated only on a *pro rata* basis if she is not "made whole." The S.P.D. expressly provides that "[i]f you do not fully recover the value of your claim, the Plan will be reimbursed on a pro-rata basis," so Spring Valley's contention would be unreasonable under the S.P.D. It is also clear that the source of Mrs. Carpenter's "make whole" right can only be the S.P.D. because E.R.I.S.A. preempts state "make whole" qualifications unless the Plan provides benefits through purchase of an insurance policy, *Cutting*, 993 F.2d at 1296, which is not shown here, and federal common law does not impose a "make whole" qualification on E.R.I.S.A. plans, *id*, at 1297–1299. *See also Serembus v. Mathwig*, 817 F.Supp. 1414, 1421–1423 (E.D.Wis.1992). We leave to the Plan to develop a reasonable formula for calculating a *pro rata* reimbursement figure in the event it reasonably determines that Mrs. Carpenter has not fully recovered the value of her claim because the language of the S.P.D. is subject to various interpretations and it is the Plan's prerogative under E.R.I.S.A. to decide on one. Such a computation is unnecessary for our purposes at any rate.

### D. The Plan's right to suspend payments.

■ The S.P.D. provides: "The Plan has the right to your full cooperation in any case involving the alleged negligence of a third party. No payment of Major Medical Benefits need be made by the Plan until a subrogation agreement has been signed and filed with the Claims Processor." This language expressly permits the Plan to suspend benefits if an injured participant fails to execute a subrogation agreement. It would not be unreasonable further for the Plan to interpret its right to "full cooperation" to also include the authority to require beneficiaries to supply information on recoveries from third-parties and to undertake not to prejudice the subrogation rights of the Plan. We do not find therefore that it would be unreasonable for the Plan to conclude that the

S.P.D. authorized it to suspend benefits pending receipt of this "full cooperation," for withholding benefits is the Plan's only remedy for uncooperativeness and a right without a remedy or enforcement is empty. If, however, a beneficiary fails to cooperate but the Plan independently receives the *full equivalent* of the information or cooperation it requires, it would be unreasonable for the Plan to conclude that this language permitted it to suspend benefits as a punitive measure.

Does the S.P.D. subrogation language reasonably permit the Plan to suspend benefits pending reimbursement of the benefits paid to Mrs. Carpenter? We don't find that the S.P.D.'s express provision permitting withholding of benefits pending the filing of a subrogation agreement was intended to be exhaustive. *See Schoonmaker,* 987 F.2d at 413–14. We also conclude that a right to periodic reimbursement from recoveries received is reasonably included within the Plan's right to full cooperation from beneficiaries under the S.P.D. Even though a signed subrogation agreement provides an enforcement device protecting the Plan's subrogation rights, it is the Plan's best protection only when it pays benefits before recoveries are received. After recoveries are made, however, the Plan's rights—and the soundness of the Plan's funds—are threatened by spendthrift beneficiaries and bankrupts, for example, for which a subrogation agreement may provide little protection. A better protection for the Plan in this circumstance is the ability to require reimbursements or to offset recoveries against future benefits. Without these options, the S.P.D.'s grant of subrogation and cooperation rights may be useless. The Plan's decision that it has the power to suspend benefits pending reimbursement is reasonable. Again, we leave to the Plan the task of reasonably determining how to calculate *pro rata* installment reimbursements.

**16.** Mrs. Carpenter asserts that she cannot read and was unable after the accident to sign documents. She does not assert, however, that the agreement could not have been read to her, that she does not understand the agreement, or that she continues to be unable to sign it.

E. *Mrs. Carpenter's cooperation.*

Springs Valley's Complaint asserts that Mrs. Carpenter's failure to cooperate consists only in her failure to reimburse the Plan and it requested a judgment declaring only that Mrs. Carpenter is not entitled to further benefits until she reimburses the Plan. Complaint pp. 7–8. The facts developed over time, however, and Springs Valley expanded its allegations of uncooperativeness in its motion for summary judgment. We will assume they were pled.

1. *Subrogation agreement.* There is no genuine dispute that Mrs. Carpenter has not executed and filed a subrogation agreement with the Plan. The depositions and affidavits of Springs Valley's representatives establish that the Plan has not received an agreement and Mrs. Carpenter admits in her filings that she has not sent one. In her response to Springs Valley's motion for summary judgment (not in her own previous summary judgment motion), Mrs. Carpenter makes a few confusing assertions to excuse her failure to execute an agreement. She asserts that she did in fact execute a subrogation agreement but then states that the agreement was for the purpose of processing Mr. Carpenter's disability claims, not her own medical and hospital claims, and she admits that she did not sign the agreement, but that her husband signed it for her.[16] (Defendant's memorandum in opposition, p. 3). The subrogation agreement to which she refers is not restricted to Mr. Carpenter's recoveries or to reimbursement of disability payments. (Eckstein deposition, Exhibit 1; Neuhoff affidavit, Exhibit C). The Plan is entitled however to a subrogation agreement that meets its reasonable requirements. *See Preze v. Board of Trustees, Pipefitters Welfare Fund Local 597,* 5 F.3d 272 (7th Cir.1993). Without Mrs. Carpenter's legal signature, and in light of Mrs. Carpenter's attorney's express warning to Springs Valley that the subrogation assignment is ineffective without her signature,[17] we find that the Plan reasonably

**17.** Mrs. Carpenter's attorney included this statement in an April 11, 1991 letter to Kimball's president: "In addition, the subrogation assignment which your company is apparently using as a basis for your position was never signed by my client. It was only signed by the tort feasor, who is your employee. I enclose a copy for your

concluded that it did not possess a subrogation agreement that was effective against Mrs. Carpenter. Mrs. Carpenter's next excuse is that the Plan never requested that she execute an agreement pertaining to her recoveries; rather, Springs Valley indicated only that a signed agreement was necessary to process her husband's disability payments. (Defendant's memorandum in opposition, p. 9–10). While it is true that a July 10, 1990 letter to Mr. Carpenter from Springs Valley requested that an enclosed subrogation assignment form be signed by both Mr. and Mrs. Carpenter in order to process Mr. Carpenter's disability claim, (Eckstein affidavit, Exhibit A), it is also true that a June 28, 1990 letter to Mrs. Carpenter alone requested that she execute an enclosed subrogation agreement in order to process her medical bills, (Neuhoff affidavit, Exhibit A). Mrs. Carpenter did not challenge the authenticity of this evidence, she did not assert that she did not receive the June 28, 1990 letter, and she presented no support for her allegation that Springs Valley never asked for a subrogation agreement. Moreover, Mrs. Carpenter has been aware at least since the commencement of this suit that the Plan requires a subrogation agreement from her and she has continued to refuse to comply. The Court finds that there is no genuine issue of material fact and Springs Valley is entitled as a matter of law to a judgment declaring that Mrs. Carpenter has not executed or filed a subrogation agreement with the Plan as requested.[18]

2. *Reimbursement.* Mrs. Carpenter admits that she has not reimbursed the Plan for any part of either the $10,000 or $25,000 recoveries she received.

3. *Other cooperation.* Springs Valley states that, after the accident, it requested Mrs. Carpenter, or her attorney, to (1) provide it with a signed subrogation assignment form, (2) inform it of the names of all insurance companies involved, (3) inform it of any settlement with third parties, (4) inform it of the amounts of any such settlement, and (5) assure it that she would protect the Plan's subrogation rights in her dealings with responsible third parties. (Plaintiff's memorandum in support, p. 4; Plaintiff's statement of material facts, p. 2). Springs Valley contends that Mrs. Carpenter has failed to (1) assure it that she will protect its subrogation rights, and (2) fully inform it of the terms and conditions, or sources of all settlements with third parties. (*Id.*). As we held above, the S.P.D. does not reasonably allow the Plan to suspend benefits for past failures to cooperate if the Plan has since received the full information it required from other sources, or the beneficiary. We do not understand that Springs Valley is doing so. While the Plan did receive notice of, and some information regarding, Mrs. Carpenter's $10,000 and $25,000 recoveries only from the insurance companies involved, not Mrs. Carpenter— and in this Mrs. Carpenter clearly violated her duty to cooperate—Springs Valley is currently requesting documentation and details of these settlements which it contends it does not have and Mrs. Carpenter has refused to provide. Springs Valley's request for this information is reasonable under the S.P.D.[19] and Mrs. Carpenter does not dispute that she has failed to comply. Mrs. Carpenter also does not dispute that she has refused the Plan's request for assurance that she will protect the Plan's subrogation rights. We therefore find no genuine issue of material fact and Springs Valley is entitled as a matter of law to a judgment declaring reasonable its decision that Mrs. Carpenter has refused to cooperate.

F. *Common law counter-claims.*

 Mrs. Carpenter counterclaimed for "compensatory damages, including mental and physical suffering, damages for the intentional infliction of emotional distress, and punitive damages" for Springs Valley's sus-

review." (Plaintiff's reply memorandum, Exhibit A). Mrs. Carpenter has not contended that the subrogation agreement is binding on her.

18. Of course, Springs Valley may only require Mrs. Carpenter to execute an agreement granting the Plan the subrogation rights provided in the S.P.D.

19. Although the Plan is subrogated under the S.P.D. only to recoveries from persons whose negligence resulted in participants' injuries, it is reasonable for the Plan to require information on settlements and recoveries from all third parties in order to determine itself whether the Plan's criteria are met.

pension of benefits. Answer and Counterclaim ¶ 5, p. 3. Springs Valley moved for summary judgment on these claims arguing that they are preempted under E.R.I.S.A. and citing *Pilot Life Insurance Co. v. Dedeaux,* 481 U.S. 41, 57, 107 S.Ct. 1549, 1558, 95 L.Ed.2d 39 (1987); *Maciosek v. Blue Cross and Blue Shield,* 930 F.2d 536, 539 (7th Cir.1991); and *Reilly v. Blue Cross & Blue Shield,* 846 F.2d 416, 418 (7th Cir.1988). Mrs. Carpenter offered no response. These claims are preempted and Springs Valley is entitled to judgment on these counterclaims as a matter of law.

### Conclusion.

The parties' cross motions for summary judgment should each be granted in part and denied in part as follows.

A. A summary judgment declaring the following is warranted:

1. The terms of the Employee Handbook summary plan description govern the Plan's subrogation rights.

2. The Plan's decision that it is entitled to reimbursement of the full value of benefits paid to Mrs. Carpenter even if she does not "fully recover" the "value of her claim" is unreasonable.

3. If Mrs. Carpenter does not "fully recover", or has not "fully recovered," the "value of her claim", as reasonably interpreted by the Plan according to the summary plan description, the Plan is entitled to reimbursement on a *pro rata* basis only.

4. The Plan is subrogated to the approximately $25,000 recovery Mrs. Carpenter received from Mr. Carpenter's liability insurer.

5. Mrs. Carpenter is required to and has failed to execute and file an effective subrogation agreement with the Plan.

6. Mrs. Carpenter is required to and has failed to provide documentation and to otherwise fully inform the Plan of the terms and conditions, or sources, of all settlements and recoveries from third parties.

7. Mrs. Carpenter is required to and has failed to assure the Plan that she will protect the Plan's subrogation rights in dealings with third parties.

8. Mrs. Carpenter is required to and has failed to reimburse the Plan for the approximately $6,000 in benefits she has received to date from the Plan.

9. The Plan's decision to suspend further payment of benefits to Mrs. Carpenter pending her (1) execution and filing of a subrogation agreement, (2) providing full documentation and information on the terms, conditions, or sources, of all settlements and recoveries from third parties, (3) assure the Plan that she will protect its subrogation rights in dealings with third parties, and (4) reimburse the Plan for benefits already received (on a *pro rata* basis, if applicable) is reasonable.

B. Because there is a genuine issue of material fact as to whether Mrs. Carpenter's injuries were caused by Bryan Kellams' negligence, summary judgment is not warranted on the issue of the Plan's subrogation rights to the approximately $10,000 Mrs. Carpenter recovered from Mr. Kellams' insurer.

C. Springs Valley is entitled to summary judgment dismissing Mrs. Carpenter's common law claims with prejudice.

Dated this 1st day of October, 1993.