Richard D. SCHOONMAKER,
Plaintiff–Appellant,

v.

The EMPLOYEE SAVINGS PLAN OF AMOCO CORPORATION AND PARTICIPATING COMPANIES, J.W. Rynne and R.W. Anderson, Defendants–Appellees.

No. 91–2944.

United States Court of Appeals,
Seventh Circuit.

Argued Sept. 14, 1992.

Decided March 1, 1993.

Jerome S. Feder (argued), Chicago, IL, for plaintiff-appellant.

Charles B. Wolf (argued) and Philip L. Mowery, Vedder, Price, Kaufman & Kammholz, Chicago, IL, for defendants-appellees.

Before CUDAHY, RIPPLE, and KANNE, Circuit Judges.

CUDAHY, Circuit Judge.

Richard Schoonmaker sued his employer's savings plan and two of its trustees for damages for breach of fiduciary duty and to enforce the plan's terms under the Employee Retirement Income Security Act of 1974 (ERISA). On cross motions for summary judgment, the district judge granted the defendants' motion and denied Mr. Schoonmaker's, concluding that the plan's trustees did not breach their fiduciary duties and the plan's procedures did not violate ERISA. We affirm in part and reverse in part.

## I.

The Employee Savings Plan of Amoco Corporation and Participating Companies (the Plan) is a defined contribution plan sponsored, maintained and administered by Amoco Corp. The plaintiff, Richard Schoonmaker, was a participant in the Plan, see 29 U.S.C. § 1002(7); defendants Jack W. Rynne, Amoco's director of corporate benefit plans, and Robert W. Anderson, Amoco vice president for human resources, were Plan fiduciaries. See 29 U.S.C. § 1002(21). Among the investment options offered to Plan participants was the opportunity to buy or sell Amoco stock once each month.

In July 1986, the plaintiff's wife, Jeannette Schoonmaker, initiated divorce proceedings against him. In February 1987 Mr. Schoonmaker spoke with an Amoco legal assistant, Brenda Willis, about the possibility of satisfying his divorce settlement using his Plan account. Congress amended ERISA in 1984 to provide that a divorced spouse of an employee could obtain rights to an employee's benefits under a qualified retirement plan if such rights were embodied in a "qualified domestic relations order" (QDRO). This provision requires plans to establish reasonable written procedures for determining the qualified status of domestic relations orders and for administering distributions under QDROs. 29 U.S.C. § 1056(d)(3)(G)(ii).

The Plan's written procedures provide that upon receipt of a domestic relations order, the Plan will notify the participant of that receipt, send a copy to the participant and, while the issue of whether the domestic relations order is qualified is being determined, the Plan Administrator will place a hold on the employee's account.[1] The Plan also followed an unwritten practice whereby it would place a hold on Plan participants' accounts once it received confirmation from both parties to a divorce proceeding that (1) the divorce was final or a DRO was being sought, (2) the Plan would receive a QDRO soon and (3) Plan assets would be a source of the QDRO payment.

During their conversation, Ms. Willis apparently told Schoonmaker that a hold would be placed on his account once the Plan learned the divorce was final. Upon Schoonmaker's request, Ms. Willis sent a copy of the Plan's QDRO procedures to Schoonmaker's lawyer. During another discussion on August 4, 1987, Ms. Willis reminded Schoonmaker of the hold procedure and agreed, at Schoonmaker's request, to forward another copy of the procedures to his lawyer.

Later in August 1987, during an informal discussion, Mr. Schoonmaker told Ms. Willis that his divorce was nearly final. On August 26, 1987, a Judgment of Dissolution of Marriage was entered, incorporating a settlement agreement that provided

---

**1.** When a hold is placed on a participant's account, the participant cannot take a distribution or a loan from the Plan and cannot execute spot transactions with the Plan until a distribution is made to the QDRO recipient.

for a distribution from Mr. Schoonmaker's Plan account to Jeannette Schoonmaker. The next day Jeannette Schoonmaker's attorney informed Ms. Willis by telephone that the divorce was final, that the settlement provided for about $80,000 from Mr. Schoonmaker's Plan account and that a DRO was forthcoming. At that point, without notifying Mr. Schoonmaker, Ms. Willis placed a hold on the entire balance of his Plan account.

On September 23, 1987, Schoonmaker attempted a spot transaction in which he would sell 2,220 shares of Amoco stock in his Plan account and have the proceeds deposited in the Plan's money market fund. When he received no written confirmation of the transaction, he contacted the Plan Administrator's office on October 19 and was told they had no record of the transaction. The next day Schoonmaker attempted another spot transaction using the expected proceeds from the September 23 transaction. The Plan told him, however, that neither transaction had been processed because of the hold on his account.

The Plan received the Schoonmakers' DRO on November 12, 1987, and the legal department deemed it qualified on November 17. In December, $87,500 was transferred from Mr. Schoonmaker's account to Jeannette Schoonmaker and the hold was removed from the account.

Meanwhile, Schoonmaker had filed a claim with Amoco in October 1987 requesting that his account be restored to a level reflecting the two attempted spot transactions, that the hold be removed and that his legal fees be reimbursed. Rynne denied the claim in a letter dated December 8, 1987. When Anderson denied Schoonmaker's appeal, Schoonmaker brought this action in state court in June 1990 against the Plan, Rynne and Anderson.[2] The defendants removed the case to the United States District Court for the Northern District of Illinois in July 1990.

After the close of discovery, the parties filed cross-motions for summary judgment.

On July 23, 1991, the district court granted summary judgment in favor of the defendants, concluding that the Plan's hold procedures did not violate the requirements of ERISA section 206(d)(3)(G)(ii), 29 U.S.C. § 1056(d)(3)(G)(ii), and that Rynne and Anderson did not breach their fiduciary duties under ERISA. Schoonmaker appeals.

## II.

A district court's grant of summary judgment is reviewed *de novo*.

ERISA requires each pension plan to establish reasonable written procedures to determine the qualified status of domestic relations orders and to administer distributions under such qualified orders. 29 U.S.C. § 1056(d)(3)(G)(ii). Amoco's Plan established such procedures, but Schoonmaker contends that the Plan's placement of a hold on his account violates this ERISA requirement because the practice is not specifically provided for in the Plan's written QDRO procedures.

The defendants argue, and the district court held, that, although the Plan's written QDRO procedures do not specifically include the Plan's informal hold practice at issue here, the practice nevertheless constituted a valid interpretation of the Plan's written procedures.

Oral representations or other informal statements cannot be used to contradict or supersede the terms of an ERISA plan. *Musto v. American General Corp.*, 861 F.2d 897 (6th Cir.), *cert. denied*, 490 U.S. 1020, 109 S.Ct. 1745, 104 L.Ed.2d 182 (1989); *Cefalu v. B.F. Goodrich Co.*, 871 F.2d 1290 (5th Cir.1989). But some courts have distinguished between such statements and those that constitute oral interpretations of plan provisions that are not contrary to the plan's written provisions. *See, e.g., Kane v. Aetna Life Ins.*, 893 F.2d 1283 (11th Cir.) *cert. denied*, 498 U.S. 890, 111 S.Ct. 232, 112 L.Ed.2d 192 (1990) (holding that an oral interpretation

---

**2.** On November 15, 1990, the district court granted a motion to dismiss another defendant, William C. Jackson, on the ground that the complaint did not allege that Mr. Jackson exercised any discretionary authority over the Plan. Mr. Schoonmaker did not appeal that decision.

of an ambiguous plan provision will be given effect); *Berger v. Edgewater Steel Co.,* 911 F.2d 911 (3d Cir.1990), *cert. denied,* —— U.S. ——, 111 S.Ct. 1310, 113 L.Ed.2d 244 (1991) (giving effect to plan sponsor's unwritten policy that superseded but did not contradict plan provisions). The central question before us, then, is whether the informal procedure that resulted in the hold being placed on Schoonmaker's account was contrary to the terms of the Plan's written QDRO procedures.

The Plan's written procedures provide that upon receipt of a domestic relations order, the Plan will notify the participant, send him or her a copy of the procedures and, "[w]hile the issue of whether a domestic relations order is a QDRO is being determined," place a hold on the participant's account.[3] The Plan's informal procedure, on the other hand, permitted a hold to be placed on the entire balance of the participant's account *before* receipt of the DRO. Such a hold was authorized when Amoco received confirmation from both parties to a divorce proceeding that the divorce was final or that a DRO was being sought, that the plan would soon receive a QDRO and that Plan assets would be a source of the QDRO payment.

The defendants argue that the written QDRO procedures only address Amoco's rights and obligations to participants and alternative payees *after* Amoco physically receives a DRO. They do not cover the period of time after Amoco knows a divorce is final and that a DRO is forthcoming, and therefore the Plan's informal procedures providing for a hold prior to receipt of the DRO are not contrary to the terms of the written procedures.

We disagree. The procedures—labeled "QDRO Procedures" and described as "Procedures to Determine the Qualified Status of Domestic Relations Orders and to Administer Distributions Under Such Qualified Orders"—constitute *the* procedures governing QDRO distributions. Implicit in these procedures is an understanding that only receipt of the DRO triggers the suc-

ceeding steps and that only while the DRO's status is being determined, and no sooner, will accounts be subject to a hold. Although the procedures do not expressly preclude an earlier hold order, they plainly purport to be the exclusive means of administering QDRO payments and thus encompass all circumstances in which a hold would be imposed. In sum, the clarity of the step-by-step procedures makes any extension of the hold procedures by "interpretation" unnecessary and inappropriate. Here, the interpretation embodied in the Plan's informal hold policy contradicts the Plan's written procedures and thus is prohibited. We certainly do not disagree with the district court's conclusion that the informal hold practice, which was developed to protect Plan beneficiaries and to minimize liability to the Plan, was reasonable. However, that reasonableness cannot overcome the fact that the practice is inconsistent with the written QDRO procedures. Specifically, the informal practice authorizes an earlier hold than do the written procedures.

By adopting the informal practice, the defendants substantially modified the written QDRO procedures. And, in so doing, they failed to comply with ERISA's amendment provisions. Section 402 of ERISA states that "[e]very employee benefit plan shall be established and maintained pursuant to a written instrument," 29 U.S.C. § 1102(a), and shall also "provide a procedure for amending such plan, and for identifying the persons who have authority to amend the plan." 29 U.S.C. § 1102(b)(3). As the Fifth Circuit noted in *Cefalu v. B.F. Goodrich Co.,* 871 F.2d 1290 (5th Cir.1989), "the writing requirement gives the plan's participants and administrators a clear understanding of their rights and obligations." *Id.* at 1296.

While some courts have given effect to interpretations of ambiguous plan provisions that are subject to varying interpretations, *see Kane v. Aetna Life Ins.,* 893 F.2d 1283 (11th Cir.1990), that is not the case here. Even if, as the defendants contend,

---

**3.** During discovery the parties produced two versions of the hold procedures, which contain minor structural and language differences not relevant to the issues in the present case.

the written QDRO provisions are merely silent as to the use of holds before receipt of a DRO, this silence differs from the kind of ambiguity at issue in *Kane.* There, the ambiguity stemmed from specific plan provisions where "reasonable persons could disagree as to [the] meaning and effect" of those provisions. *Id.* at 1285. Contrarily, the Amoco Plan's written QDRO procedures are plain in their meaning, which does not suggest the propriety of a hold *before* receipt of a DRO. Hence, even if we adopted the interpretation/modification distinction set forth in *Kane,*[4] the Plan's informal hold practice does not conform with that narrow exception to the writing requirement.

In addition, the district court's concern about the impossibility of Plan administrators anticipating every factual scenario that might arise is less persuasive given that the defendants established the informal hold practice well before Schoonmaker's dispute with the Plan arose. In sum, the practice is an amendment or a modification, not an interpretation, and the defendants had a duty to incorporate it into the written Plan provisions. *See Nachwalter v. Christie,* 805 F.2d 956, 960 (11th Cir. 1986) (ERISA's "written agreement" provision, in light of its requirement of formal written amendments, necessitates conclusion that ERISA precludes oral modifica-

tions of plans); *Johnson v. Central States, Southeast & Southwest Areas Pension Funds,* 513 F.2d 1173, 1174–75 (10th Cir. 1975) (benefits cannot be enforced according to a booklet and letter that are inconsistent with the terms of the written pension plan). Therefore, under section 502 of ERISA, 29 U.S.C. § 1132, which authorizes civil enforcement of the Act, the plaintiff is entitled to recover for losses resulting from a premature application of the hold.[5]

■ Although the informal hold practice constituted an unauthorized modification of the QDRO procedures, we do not believe the administrators' role in this case rose to the level of a breach of fiduciary duty. In *Lister v. Stark,* 11 Employee Benefits Cas. (BNA) 1611, 1989 WL 88241 (N.D.Ill.1989), where beneficiaries claimed the plan committee's denial of benefits to them constituted a breach of fiduciary duty, the court stated that "[t]o breach one's fiduciary duty, an ERISA trustee must do more (and worse) than wrongfully construing the plan provisions." *Id.* at 1617.[6] The present case is quite different from *Lister* in that it does not involve "a simple, but incorrect, denial of benefits," *id.,* and in that, in accordance with our discussion *supra,* the enforcement of the hold procedure necessarily went beyond "construing the plan provisions." Nevertheless, the highly unusual circumstances of the present case

---

**4.** In *Russo v. Health, Welfare & Pension Fund,* 984 F.2d 762 (7th Cir.1993), we expressly did not resolve the question whether the *Kane* exception applies in this circuit. *Id.* at 767–68. We noted that other circuits also have stopped short of adopting *Kane. Id.* at 767 n. 5 (citing *Williams v. Bridgestone/Firestone, Inc.,* 954 F.2d 1070, 1073 (5th Cir.1992) and *Law v. Ernst & Young,* 956 F.2d 364, 370 n. 9 (1st Cir.1992)).

**5.** Specifically, section 502(a) provides, in pertinent part, that a civil action may be brought

(1) by a participant or beneficiary—

. . . . .

(B) to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan;

(2) by the Secretary, or by a participant, beneficiary or fiduciary for appropriate relief under section 1109 of this title;

(3) by a participant, beneficiary, or fiduciary (A) to enjoin any act or practice which vio-

lates any provision of this subchapter or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this subchapter or the terms of the plan.

29 U.S.C. § 1132(a).

Under section 502(a)(1)(B), therefore, the plaintiff, an undisputed participant in the Plan, can bring a civil action against the Plan "to recover benefits due to him under the terms of his plan" and "to enforce his rights under the terms of the plan." *See, e.g., Henglein v. Informal Plan for Plant Shutdown Ben. for Salaried Employees,* 974 F.2d 391, 396 (3d Cir.1992) (stating that section 502(a)(1)(B) "authorizes a cause of action against a plan to recover benefits due"); *Allstate Ins. Co. v. 65 Security Plan,* 879 F.2d 90, 94 (3d Cir.1989).

**6.** *Lister* was subsequently reversed in part by this court, 942 F.2d 1183 (7th Cir.1991), but the district court's conclusions about whether the defendants breached their fiduciary duty were not challenged on appeal. 942 F.2d at 1186 n. 3.

counsel an application of the principle expressed in *Lister*. Because the Plan placed the hold on the plaintiff's account on August 27, 1987, instead of sometime after November 12, as called for under written QDRO procedures, the plaintiff suffered significant losses. But only in rare situations—such as the precipitous drop in stock prices that occurred in October 1987—would the premature hold procedure prove so detrimental to a Plan participant. Rynne and Anderson wrongly denied the plaintiff's claim to have his account restored, but their actions were consistent with their duty to protect the interests of Plan beneficiaries as well as participants. We therefore cannot conclude that the Plan administrators breached their fiduciary duty.

### III.

We conclude that the Amoco Plan's informal hold practice violated the requirements of section 206(d)(3)(G)(ii) of ERISA and that the plaintiff is entitled to recover from the Plan. For the foregoing reasons, we RE-VERSE the judgment of the district court granting summary judgment in favor of the Plan, AFFIRM summary judgment in favor of the defendant administrators and REMAND for further proceedings not inconsistent with this opinion.