Rosanne M. DAY, Plaintiff,

v.

Jennifer M. WALL, Carla A. Kot, Thomas S. Brenner, Brenner, Brenner & Wall, and Philip Morris Deferred Profit–Sharing Plan, Defendants.

No. 99–C–0185.

United States District Court,
E.D. Wisconsin.

Sept. 7, 2000.

Christopher T. Kolb, Milwaukee, WI, for plaintiff.

Edward A. Hannan, Milwaukee, WI, for Jennifer M. Wall, defendant.

David R. Cross, Milwaukee, WI, Steuart H. Thomsen, Washington, DC, for Philip Morris, defendant.

### *DECISION AND ORDER*

ADELMAN, District Judge.

Plaintiff Rosanne M. Day brought a lawsuit in Waukesha County Circuit Court claiming: (1) that defendants Jennifer M. Wall, Carla A. Kot and Thomas S. Brenner, attorneys with the law firm of Brenner, Brenner and Wall, also a defendant, (collectively "Wall defendants"), negligently represented her in a divorce case, in particular, in failing to timely obtain a qualified domestic relations order (QDRO); and (2) that defendant Philip Morris Deferred Profit–Sharing Plan (the Plan) violated its own rules and the Employee Retirement Income Security Act (ERISA) in October 1993 by distributing funds to plaintiff without having received a QDRO and in October 1997 by refusing to distribute funds to her upon receiving a QDRO. The Plan removed the case to this court under 28 U.S.C. § 1441 based on the presence of a federal question. See 28 U.S.C. § 1331. At the parties' request I stayed the claim against the Wall defendants pending resolution of plaintiff's claim against the Plan. Before me now are plaintiff's motion for partial summary judgment on the issue of liability and the Plan's motion for summary judgment.

### I. FACTUAL BACKGROUND

In February 1992 plaintiff was divorced from her husband Thomas Day. Mr. Day was employed by Miller Brewing Company, a Philip Morris subsidiary, and participated in Philip Morris's deferred profit-sharing plan. The Plan is a defined contribution plan in which each participant has an account. See 29 U.S.C. § 1002(34). Miller made contributions to Mr. Day's account, and Mr. Day chose how to invest the funds under available investment options. The divorce settlement agreement provided that the value of Mr. Day's account as of December 31, 1991 was $233,-320, and that $225,000 plus interest on this sum from December 31, 1991 through the date of the transfer would be transferred to plaintiff as an alternate payee under a QDRO. As of December 31, 1991, over half of Mr. Day's account was invested in Philip Morris stock and, effective March 31, 1992, Mr. Day directed that the entire account be invested in Philip Morris stock.

Upon entry of the divorce decree the Wall defendants were to obtain a QDRO from the divorce court. Under its own rules the Plan was prohibited from transferring a participant's funds to a former spouse without having received a QDRO. In December 1992 the Wall defendants submitted a proposed QDRO to the Plan for its comments, and in August 1993 the Plan approved a revised proposal and sent a copy of its letter of approval to plaintiff with a rollover election form. The Wall defendants, however, never submitted the proposed order to the state court for approval, and thus did not submit a QDRO to the Plan. The Plan nevertheless proceeded to process the transfer of funds to plaintiff. Plaintiff completed the rollover election form and the Plan set up a subaccount of

Mr. Day's account and transferred into it the percentage of funds called for in the proposed but unapproved order. In October 1993, pursuant to plaintiff's request the Plan distributed the funds in the sub-account to an IRA designated by plaintiff. Since December 31, 1991, however, the value of Philip Morris stock had declined, thus, as of September 30, 1993, plaintiff's interest in Mr. Day's account was worth only $140,484.92.

Plaintiff was dissatisfied with the amount of the distribution and so advised the Wall defendants. In July 1995 the Wall defendants notified the Plan that the state court had never approved the QDRO. The Plan, however, made no attempt to recover the funds it had mistakenly distributed to plaintiff. Plaintiff subsequently discharged the Wall defendants and retained new counsel. In September 1997 plaintiff's new counsel obtained a QDRO from state court judge Patrick A. Haughney. The QDRO provided:

> Philip Morris is hereby ordered to assign 96.4% as of December 31, 1991 from Thomas A. Day's account to an account for Rosanne M. Day. This amount shall be separately accounted for and shall be adjusted for all earnings or losses in value from December 31, 1991 to the date of distribution.

(Sompolski Decl.Ex. 24; Sanders Aff.Ex. 3.)

In October 1997 counsel submitted the QDRO to the Plan and requested that the Plan distribute funds to plaintiff. He argued that under Plan rules the 1993 distribution was void and asked that the Plan make good the loss to plaintiff resulting from the improper 1993 distribution with a deduction for the amount of that distribution. By this time the value of Philip Morris stock was above its level of December 31, 1991. On June 26, 1998, the Plan advised plaintiff's counsel that, although the Haughney order was a proper QDRO, the Plan had decided to deny plaintiff's request for a distribution because "the amounts required to be distributed to the

Alternate Payee have, at her request, already been paid to her, there are no further amounts due the Alternate Payee under the terms of the QDRO." (Sompolski Aff.Ex. 1 at 1.) At the time of the Plan's decision the value of plaintiff's IRA was about $262,000 and the value of her interest in Mr. Day's account would have been approximately $444,000 but for the October 1993 distribution. Plaintiff objected to the Plan's decision and appealed unsuccessfully to Philip Morris's Corporate Employee Benefit Committee.

## II. SUMMARY JUDGMENT STANDARD

Summary judgment is required "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *See* Fed. R.Civ.P. 56(c). The mere existence of some factual dispute does not defeat a summary judgment motion; "the requirement is that there be no *genuine* issue of *material* fact." *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). For a dispute to be genuine, the evidence must be such that a "reasonable jury could return a verdict for the moving party." *See id.* For the fact to be material, it must relate to a disputed matter that "might affect the outcome of the suit." *See id.* In evaluating a motion for summary judgment, the court must draw all inferences in a light most favorable to the nonmoving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

When both parties have moved for summary judgment, both are required to show no genuine issues of fact exist, taking the facts in the light most favorable to the party opposing each motion. If issues of fact exist, neither party is entitled to summary judgment. *See Lac Courte Oreilles*

*Band of Lake Superior Chippewa Indians v. Voigt,* 700 F.2d 341, 349 (7th Cir.1983).

The fact that both parties have moved for summary judgment, and thus both parties simultaneous contend that there is no genuine issue of fact, does not establish that a trial is unnecessary or empower me to enter judgment as I see fit. *See* 10A Charles Alan Wright et al., *Federal Practice & Procedure* § 2720, at 327–28 (3d ed.1998). I may grant summary judgment only if one of the moving parties is entitled to judgment as a matter of law on the basis of the material facts not in dispute. *Mitchell v. McCarty,* 239 F.2d 721, 723 (7th Cir.1957). If both parties move for summary judgment, however, it may very well mean that the dispute more likely concerns the law rather than the facts, as is the case here where there do not appear to be serious factual disputes.

## III. DISCUSSION

### A. Standard of Review of Plan Administrator's Denial of Benefits

■ Courts reviewing decisions of administrators of ERISA plans to deny benefits sought by participants or beneficiaries do so under a de novo standard unless the plan unambiguously confers discretion on the administrator to determine benefit eligibility, in which case courts review the decision under the more deferential arbitrary and capricious standard. *Herzberger v. Standard Ins. Co.,* 205 F.3d 327, 331 (7th Cir.2000). The reason for this rule is that because important employee interests are at stake the employer must make clear whether a plan confers a solid right to benefits or merely the right to appeal to the discretion of the plan's administrator. *Id.*

■ The Plan argues that the Plan document confers such discretion, pointing to the following clause: "7. Except in those cases in which the power of determination is expressly reserved to a Participating Company, the appropriate Fiduciary shall have full power and authority to determine all matters arising in the administration, interpretation and application of the Plan." (Browne Decl.Ex. 1 at 48.) However, *Herzberger* clarified that the Seventh Circuit will not assume plan discretion simply by virtue of a description of the plan administrative committee's functions. *Krueger Int'l, Inc. v. Blank,* 225 F.3d 806, 809 (7th Cir.2000). The language relied on by the Plan does not unambiguously confer discretion on the Plan administrator to deny benefits to participants or beneficiaries. A participant or beneficiary reading the provision would not reasonably understand it to be a statement that his or her eligibility for benefits depended on the discretion of the administrator rather than on the language of the Plan. Therefore, I review de novo the Plan's decision to deny benefits to plaintiff.[1]

### B. Applicable Provisions of ERISA

Title 29 U.S.C. § 1132(a)(1)(B) permits a participant or beneficiary of an ERISA plan "to recover benefits due" under the terms of plan. Under the anti-alienation provisions of ERISA, 29 U.S.C. § 1056(d)(1), and the Internal Revenue Code, 26 U.S.C. § 401(a)(13), benefits may not generally be "assigned or alienated." Benefits, however, may be transferred to a participant's former spouse to effectuate the terms of a divorce settlement as long as the transfer is authorized by "a qualified domestic relations order." 29 U.S.C. § 1056(d)(3)(A). Employee benefit plans must be operated under "a written instrument," 29 U.S.C. § 1102(a)(1), and must establish written procedures "to determine the qualified status of domestic relations orders and to administer distributions under such qualified orders," 29 U.S.C. § 1056(d)(3)(G)(ii). Moreover, fiduciaries must act "in accordance with the docu-

---

1. I note, however, that even if the arbitrary and capricious standard applied I would reach the same decision on the motions for summary judgment.

ments and instruments governing the plan." 29 U.S.C. § 1104(1)(a)(D).

## C. Effect of 1993 Transfer

As stated, ERISA permits the transfer of benefits to a former spouse only where the transfer is authorized by a QDRO. In compliance with ERISA the Plan adopted written rules prohibiting transfers unauthorized by QDROs. Article XII of the Plan provides:

> The right of any person to receive any distribution or to withdraw any amount pursuant to the Plan shall not be subject in any manner to anticipation, alienation, sale, transfer, assignment, pledge, encumbrance or charge or to the creation, assignment or recognition of a right to any benefits under the Plan pursuant to a domestic relations order, unless determined to be a Qualified Domestic Relations Order and any attempt to anticipate, alienate, sell, transfer, assign, pledge, encumber or charge the same, or to create, assign or recognize a right to the same pursuant to a domestic relations order which is not a Qualified Domestic Relations Order shall be void; nor shall said right be in any manner liable for or subject to the debts, contracts, liabilities, engagements or torts of any such person.

(Browne Decl.Ex. 1 at 44.) The Plan's 1993 transfer of funds out of Mr. Day's account and its distribution of such funds to plaintiff was an "attempt ... to ... transfer, assign ... or recognize a right" to benefits "pursuant to a domestic relations order which [was] not" a QDRO. *Id.* Therefore, the transfer and distribution were unauthorized by the Plan.

Moreover, under the terms of the Plan the transfer and distribution of funds to a former spouse without a QDRO were "void." *Id.* According to Black's Law Dictionary 1568 (7th ed.1999) acts that are "void" are:

> Of no legal effect; null. The distinction between *void* and *voidable* is often of great practical importance. Whenever technical accuracy is required, *void* can be properly applied only to those provisions that are of no effect whatsoever—those that are an absolute nullity.

Thus, the 1993 transfer and distribution were not only unauthorized but were nullities. They had no legal effect.

Moreover, in July 1995 the Plan was put on notice of the fact that it had distributed funds to a participant's former spouse without a QDRO in violation of its own rules. The Plan, however, made no effort to recover the funds. A strong argument can be made that by failing to attempt to recover the funds it mistakenly distributed or to otherwise correct its error, the Plan breached its fiduciary duty to administer the Plan according to its terms. *See* 29 U.S.C. § 1104(a)(1)(D); *Reynolds v. Bethlehem Steel Corp.*, 619 F.Supp. 919, 924–25 (D.Md.1984) (failure to correct administrative error in which lump sum benefit was mistakenly granted would have been breach of duty to administer plan in accordance with its terms); *see also Blue Cross & Blue Shield v. Weitz*, 913 F.2d 1544, 1547 (11th Cir.1990) (ERISA authorizes fiduciary to bring claim against provider for payment of unauthorized medical expenses); *Nass v. Staff Retirement Plan of Local 810*, 515 F.Supp. 950, 960 (S.D.N.Y.) (fiduciaries' past errors in computing benefits could not limit their ability to administer plan in the future in accordance with plan terms), *aff'd*, 671 F.2d 492 (2d Cir.1981).

To summarize the effects of the Plan's conduct, the 1993 transfer was legally void and the Plan's inattention to its error once it was discovered may have been a breach of fiduciary duty.

## D. Plaintiff's 1997 Request for Benefits

In October 1997 plaintiff submitted a QDRO to the Plan and requested a distribution of benefits. The Plan refused plaintiff's request based on the 1993 distribution. Plaintiff contends that under ERISA and Plan rules the Plan was

obliged to honor her request. The Plan disputes this on several grounds. First, it argues that that the 1993 distribution provided plaintiff with the benefits called for in the 1997 order. There are several problems with this argument: (1) the QDRO contains no language suggesting that it had been satisfied by a previous distribution; (2) the argument suggests that, contrary to ERISA and the Plan, the QDRO was meaningless and plaintiff need not have bothered to obtain it; (3) the argument overlooks that the 1993 distribution was void; and (4) the argument minimizes the legal significance both of the Plan's error and its failure to attempt to correct the error. The Plan cites language in *Varity Corp. v. Howe*, 516 U.S. 489, 514, 116 S.Ct. 1065, 134 L.Ed.2d 130 (1996), concerning a fiduciary's duty to preserve assets to satisfy future beneficiaries. This language, however, only reinforces the seriousness of the Plan's failure to attempt to preserve the Plan assets that it mistakenly distributed.

Second, the Plan argues that it was not required to comply with plaintiff's 1997 request because as the result of the 1993 distribution plaintiff suffered no loss. Once again, the Plan ignores that the 1993 distribution was void. The distribution had no legal effect regardless of whether plaintiff won, lost or broke even. Moreover, plaintiff did in fact suffer a loss both because she received funds to which she had no legal right and which she probably could have been compelled to return and because she received a lesser sum than she would have had the Plan not violated its rules.

■ Third, the Plan argues that because of the 1993 distribution there were insufficient funds in Mr. Day's account in 1997 to comply with the QDRO and that plaintiff had no right to receive amounts that were not in his account. The problem with this contention is that the only reason Mr. Day's account lacked sufficient funds to honor plaintiff's 1997 request was because of the Plan's previous error. Further, a plan may be required to add money

to a participant's account where the deficit was caused by the plan's failure to comply with its own written procedures. *Schoonmaker v. Employee Sav. Plan of Amoco Corp.*, 987 F.2d 410 (7th Cir.1993).

The Plan attempts to distinguish *Schoonmaker* on the ground that there the plan refused the plaintiff's request for funds, whereas here the Plan complied with plaintiff's request. The Plan's attempt to shift the focus from its own conduct to plaintiff's is neither becoming nor persuasive. There is no evidence in the record that plaintiff knew about ERISA or Plan rules or committed any act that was improper or manipulative. It was the Plan's responsibility, not plaintiff's, to see that its rules were enforced. At bottom, *Schoonmaker* stands for the proposition that a plan may not act in a way that "is inconsistent with the written QDRO procedures," *id.* at 413, a proposition that governs the outcome of this case. *See also Guidry v. Sheet Metal Workers Nat'l Pension Fund*, 493 U.S. 365, 110 S.Ct. 680, 107 L.Ed.2d 782 (1990) (rejecting lower court's attempt to create an equitable exception to ERISA's anti-alienation provisions); *Riordan v. Commonwealth Edison Co.*, 128 F.3d 549, 552 (7th Cir.1997) (instructing courts to strictly enforce Plan terms).

Fourth, the Plan argues that the anti-alienation provisions of ERISA and the Plan do not provide a basis for plaintiff to receive an additional distribution. However, under ERISA benefits may not be "assigned or alienated" unless the transfer is authorized by a "qualified domestic relations order." 29 U.S.C. § 1056(d)(1) & (3)(A). And the Plan prohibits any "attempt to ... transfer, assign ... or recognize a right to benefits pursuant to a domestic relations order which is not" a QDRO. (Browne Decl.Ex. 1 at 44.) Benefits are "assigned or alienated" under ERISA whenever an attempt is made to dispose of them. *Fox Valley & Vicinity Constr. Workers Pension Fund v. Brown*, 897 F.2d 275, 279 (7th Cir.1990). The Plan's transfer of funds from Mr. Day's account to plaintiff's subaccount and its subsequent distribution of benefits to

plaintiff clearly were an attempt to dispose of benefits and thus fall within the anti-alienation language of both ERISA and the Plan.

The Plan, however, contends that the purpose of the anti-alienation provisions was not to bar transfers of this type. However, Congress enacted the QDRO provisions of ERISA "to protect the financial security of divorcees." *In Re Gendreau*, 122 F.3d 815, 819 (9th Cir.1997). By requiring a court order to be in place before permitting any transfer of benefits Congress ensured that any agreement on division of pension plan assets would be subject to judicial review before being implemented. Further, Congress's intent was to establish clear rules governing the duties of pension plans and prevent plans from making discretionary decisions in this area or looking beneath the surface of QDROs. Congress's idea was to make compliance obligatory. *Blue v. UAL Corp.*, 160 F.3d 383, 385 (7th Cir.1998). Thus, the purpose of the anti-alienation provisions was precisely to prevent transactions of the type that occurred here.

To sum up, in the case at bar the Plan distributed funds to plaintiff without having received a QDRO. This act violated ERISA and was void under Plan rules. The Plan discovered its error in July 1995 but made no effort to address the problem. Had it made such an effort it could likely have avoided this lawsuit. In 1997 plaintiff presented the Plan with a QDRO and requested benefits. Under Plan rules and ERISA the Plan had no choice but to comply with this request. Thus, unless the Plan's claim of laches has merit plaintiff's motion for partial summary judgment on the issue of liability must be granted.

### E. Laches

■ The Plan also contends that plaintiff's claim is barred by laches. Laches is an equitable defense applicable to claims under ERISA. *Bennett v. Tucker*, 827 F.2d 63, 68 (7th Cir.1987). To prevail on a laches defense a defendant must show that (1) the plaintiff delayed filing suit for an unreasonable and inexcusable length of time after the plaintiff knew or reasonably should have known of the claim, and (2) the delay operated to the prejudice or injury of the defendant. *Winchester v. Pension Comm. of Michael Reese Health Plan, Inc.*, 942 F.2d 1190, 1194 (7th Cir. 1991). The mere passage of time does not constitute laches; the delay must be unreasonable and inexcusable. *See Winchester*, 942 F.2d at 1194. Further, prejudice can be either economic (such as the change in the value of an asset), evidentiary (such as the impairment of a defendant's ability to put on a full and fair defense due to the loss of records or unreliability of memories of past events), or both. *See Winchester*, 942 F.2d at 1194; *Lake Caryonah Improvement Ass'n v. Pulte Home Corp.*, 903 F.2d 505, 510 (7th Cir.1990).

■ Here, the Plan has not shown that the timing of the suit caused either unreasonable delay or prejudice. The Plan learned in July 1995 that it had improperly distributed funds to plaintiff in October 1993. It could have avoided both delay and prejudice by trying to correct its error either through negotiation or by bringing an action to recover the benefits or obtain declaratory relief. Moreover, plaintiff did not unreasonably or inexcusably delay filing this suit. Ill-served by the Wall defendants, she obtained new counsel, who obtained a QDRO and requested benefits. No reasonable jury could find that the Plan could not have reasonably avoided the delay or any problems related thereto or that plaintiff was guilty of unreasonable delay. Thus, the Plan's defense of laches fails and plaintiff's motion for partial summary judgment on the issue of liability will be granted.

### F. Prejudgment Interest

Plaintiff seeks prejudgment interest from June 26, 1998, the date that the Plan denied plaintiff's request for benefits pursuant to the QDRO. Prejudgment interest is available to compensate a plaintiff for the loss of the use of money during the period that payment was improperly delayed and to prevent a Plan from being unjustly enriched where it improperly held

onto funds that should have been paid earlier. *Rivera v. Benefit Trust Life Ins. Co.*, 921 F.2d 692, 696–97 (7th Cir.1991). Here, I have found that the Plan should have honored plaintiff's 1997 request for an additional distribution. Payment has been improperly delayed since June 26, 1998, and the Plan has been unjustly enriched. Thus, plaintiff is entitled to prejudgment interest from that date.

### CONCLUSION

For the foregoing reasons,

**IT IS HEREBY ORDERED** that plaintiff's motion for partial summary judgment on the issues of liability and prejudgment interest from June 26, 1998 is **GRANTED**.

**IT IS ORDERED** that defendant's motion for summary judgment is **DENIED**.

**AND, FINALLY IT IS ORDERED** that there will be a telephone status conference on **September 22, 2000 at 10:30 a.m.** to discuss possible settlement and any remaining issues including damages.