Sharon E. JONES, Appellant,

v.

AMERICAN AIRLINES, INC. and American Airlines, Inc. Pilot Retirement Benefit Program, Appellees.

No. 2–02–179–CV.

Court of Appeals of Texas, Fort Worth.

Feb. 26, 2004.

---

57. *See, e.g., id.*

John F. Taylor, Fort Worth, for appellant.

Kelly Hart & Hallman, P.C., Marshall M. Searcy, Jr., Jeffrey R. Grable, Fort Worth, for appellees.

Panel B: DAUPHINOT, GARDNER, and WALKER, JJ.

## OPINION

ANNE GARDNER, Justice.

Appellant Sharon E. Jones appeals from a turnover order directing her to pay $410,540.32, plus any post-judgment interest, into the registry of the court for the benefit of Appellees American Airlines, Inc. and American Airlines, Inc. Pilot Retirement Benefit Program. Jones challenges the turnover order in two issues, arguing that the trial court erred in its implied findings (1) that her Individual Retirement Account ("IRA"), into which the pension fund payments were rolled over, did not qualify under the Internal Revenue Code and (2) that the funds ordered turned over by the trial court were not exempt under Texas law from turnover as the proceeds of exempt property. We affirm.

## I. FACTUAL AND PROCEDURAL BACKGROUND

In 1995, Sharon Jones divorced Leslie Jones, who had a pension plan with Appellees. As part of the divorce proceedings, the divorce court entered a Qualified Domestic Relations Order (QDRO), under which Appellees were to pay a portion of Mr. Jones's pension funds to Appellant with interest. *See* TEX. FAM.CODE ANN. §§ 9.101–9.105 (Vernon 1998) (governing post-decree QDROs). Mr. Jones filed a lawsuit against Appellees in the United States District Court in Fort Worth, Texas, under the Employee Retirement Income Security Act of 1974 (ERISA). *See* 29 U.S.C.A. §§ 1001 et seq. (1999 & Supp.2003). Under ERISA, in the event of a divorce, benefits due under the terms of an ERISA plan may be transferred to a participant's former spouse according to the terms of a valid QDRO. *Id.* § 1056(d)(3)(A); *Day v. Wall,* 112 F.Supp.2d 833, 836 (E.D.Wis.2000). Mr. Jones asserted that Appellees wrongfully

paid benefits to Appellant, instead of paying them to him. Appellees joined Appellant as a third-party defendant to the federal lawsuit, contending that if proceeds had been wrongfully paid to Appellant, they were entitled to equitable reimbursement from her.

Appellees settled with Mr. Jones and proceeded to trial on their third-party claims against Appellant. After a trial to the bench, the federal court ruled for Appellees on their claims against Appellant and found that Appellees were entitled to recover $410,540.32 in mistakenly paid benefits:

> I find that Sharon Leutwyler, then Sharon Jones, equitably should be required to repay defendant's—the plan benefits she was overpaid, that is, the $167,445.67 and the $243,094.65. I don't think she suffered any detrimental reliance by reason of the overpayment.... I find that Sharon knew that there was a dispute as [to] the amount Jones, her husband, should receive and the amount she should receive. And she knew that before she received any payments and should have taken that into account in whatever planning she engaged in.[1]

The federal court signed a judgment in accordance with its ruling, awarding Appellees $410,540.32, plus post-judgment interest. Appellant did not appeal the federal court's judgment. After Appellees learned through post-trial discovery that Appellant had withdrawn and transferred $463,128 to various accounts in the weeks leading up to the federal trial, the parties entered an agreed injunction on August 30, 2001, which froze all of Appellant's retirement accounts, including, but not limited to, accounts she held at Securities America, Inc., Morgan Stanley Dean Witter, and Wells Fargo Bank, N.A.

Appellees initiated collection proceedings in the federal court, but the federal court declined to further exercise jurisdiction over the matter. *See United Mine Workers v. Gibbs*, 383 U.S. 715, 725, 86 S.Ct. 1130, 1138, 16 L.Ed.2d 218 (1966) (discussing the doctrine of pendent jurisdiction). Consequently, Appellees filed an application for a turnover order in the 153rd District Court of Texas. *See* TEX. CIV. PRAC. & REM.CODE ANN. § 31.002 (Vernon Supp.2004). Appellant filed an answer in which she asserted that the funds were exempt from turnover proceedings under section 31.002(f) of the Texas Civil Practice and Remedies Code and section 42.0021 of the Texas Property Code. *See id.* § 31.002(f); TEX. PROP.CODE ANN. § 42.0021 (Vernon 2000).

After a hearing on Appellees' petition, the court signed a turnover order, which required Appellant to turn over to the registry of the court $410,540.32 plus post-judgment interest. The order also awarded attorneys' fees to Appellees in the amount of $35,000 plus conditional appellate attorneys' fees.[2] No findings of fact and conclusions of law were requested or filed. Appellant timely filed her notice of appeal.[3]

---

1. The federal court also stated that it found that Appellees "were negligent in paying her those benefits," but it did not think that was a "reason for denying them equitable reimbursement under the facts of this case."

2. On May 31, 2002, the trial court issued judgment *nunc pro tunc* to correct a clerical error in the numbering of an account listed in the turnover order.

3. Because Appellant had not complied with the turnover order, Appellees filed a contempt motion. This court abated the appeal, remanded the case to the trial court, and directed the court to conduct a hearing on Appellees motion. Following the show cause hearing, Appellees notified this court of the . withdrawal of their motion for contempt.

## II. Issues on Appeal

In two issues, Appellant complains that the trial court erred (1) by its implied finding that her IRA did not qualify under the applicable provisions of the Internal Revenue Code and (2) by its implied finding that the funds ordered turned over were not exempt from turnover as the proceeds of exempt property. We construe Appellant's arguments under these two issues as a challenge to the legal sufficiency of the evidence supporting these implied findings. Appellees respond that the trial court did not abuse its discretion in rejecting the exemption claims of Appellant to the mistakenly paid benefits and ordering turnover relief. Appellees have also requested appellate attorneys' fees.

## III. Texas Turnover Statute and Texas Property Code Section 42.0021

As we stated in *Dale v. Finance America Corp.*, "The Texas 'turnover' statute ... is a procedural device by which judgment creditors may reach assets of a debtor that are otherwise difficult to attach or levy on by ordinary legal process." 929 S.W.2d 495, 498 (Tex.App.-Fort Worth 1996, writ denied); *see* Tex. Civ. Prac. & Rem.Code Ann. § 31.002. The turnover statute provides for turnover relief as follows:

(a) A judgment creditor is entitled to aid from a court of appropriate jurisdiction through injunction or other means in order to reach property to obtain satisfaction on the judgment if the judgment debtor owns property, including present or future rights to property, that:

(1) cannot readily be attached or levied on by ordinary legal process; and

(2) is not exempt from attachment, execution, or seizure for the satisfaction of liabilities.

Tex. Civ. Prac. & Rem.Code Ann. § 31.002(a). However, "[a] court may not enter or enforce an order under this section that requires the turnover of the proceeds of, or the disbursement of, property exempt under any statute, including Section 42.0021, Property Code." *Id.* § 31.002(f).

Section 42.0021, entitled "Additional Exemption for Retirement Plan," provides in pertinent part:

(a) In addition to the exemption prescribed by Section 42.001, a person's right to the assets held in or to receive payments, whether vested or not, under any stock bonus, pension, profit-sharing, or similar plan, including a retirement plan for self-employed individuals, and under any annuity or similar contract purchased with assets distributed from that type of plan, and under any retirement annuity or account described by Section 403(b) or 408A of the Internal Revenue Code of 1986, and under any individual retirement account or any individual retirement annuity, including a simplified employee pension plan, is exempt from attachment, execution, and seizure for the satisfaction of debts unless the plan, contract, or account does not qualify under the applicable provisions of the Internal Revenue Code of 1986....

(b) Contributions to an individual retirement account ... and any accrued earnings on such contributions are not exempt under this section unless otherwise exempt by law.... In addition, amounts qualifying as nontaxable rollover contributions under Section 402(c), 402(e)(6), 402(f), 403(a)(4), 403(a)(5), 403(b)(8), 403(b)(10), 408(d)(3), or 408A of the Internal Revenue Code of 1986 on or

after January 1, 1993, are treated as exempt amounts under Subsection (a).

TEX. PROP.CODE ANN. § 42.0021(a), (b). The legislature enacted section 42.0021 in 1987 in response to federal decisions holding that the benefits of retirement plans held by debtors in bankruptcy proceedings were not protected from the claims of creditors in Texas. TEX. PROP.CODE ANN. § 42.0021; *see, e.g., In re Goff,* 706 F.2d 574, 587–88 (5th Cir.1983) (holding that the retirement plan benefits were property of the bankruptcy estate, where no Texas law exempted those benefits from creditor's claims); *In re Brooks,* 60 B.R. 155, 160 (Bankr.N.D.Tex.1986) (ruling that debtor's interest in a retirement plan was not exempted from the bankruptcy estate under Texas law); *see also* M. Bruce Peele, *Retirement Plan—Benefits Are they Exempt,* 53 TEX. B.J. 114, 114–115 (discussing *Goff* and the enactment of section 42.0021 of the property code).

As one commentator had observed, section 42.0021 "is designed to protect retirement benefits from the claims of creditors," including judgment creditors. Katherine C. Hall, *Retirement Benefits: Texas Property Code Amendment,* 50 TEX. B.J. 993, 993 (1987). However, this protection is not without limits. While section 42.0021 was enacted "to protect the unwary debtor from having his [or her] retirement funds seized for payment of past debts," it was not intended to "become a safe-haven for sham retirement plans created to defraud creditors." Joseph V. Gote, *The Texas Exemption of Retirement Benefits: Interaction with the Bankruptcy Code and Possible Preemption by Mackey v. Lanier Collections Agency and Service,* 50 HOUS. L.REV. 497, 515 (1989). Thus, if a debtor places funds in a retirement plan in an attempt to defraud his or her creditors, those creditors "can still exercise their rights [concerning those funds] ... re-

gardless of the type of retirement plan or the amount of deductible or excess contribution involved." Hall, 50 TEX. B.J. at 994.

## IV. STANDARD OF REVIEW

■ We review a trial court's application of the turnover statute under an abuse of discretion standard. *Beaumont Bank, N.A. v. Buller,* 806 S.W.2d 223, 226 (Tex. 1991); *DeVore v. Central Bank & Trust,* 908 S.W.2d 605, 608 (Tex.App.-Fort Worth 1995, no writ). Under an abuse of discretion standard, legal and factual insufficiency challenges do not constitute independent grounds of error, but are factors we examine in assessing whether the trial court abused its discretion. *DeVore,* 908 S.W.2d at 608.

■ To determine whether the trial court abused its discretion, we must decide whether a trial court acted without reference to any guiding rules or principles; in other words, whether the act was arbitrary or unreasonable. *See Carpenter v. Cimarron Hydrocarbons Corp.,* 98 S.W.3d 682, 687 (Tex.2002); *Downer v. Aquamarine Operators, Inc.,* 701 S.W.2d 238, 241–42 (Tex.1985), *cert. denied,* 476 U.S. 1159, 106 S.Ct. 2279, 90 L.Ed.2d 721 (1986). Merely because a trial court may decide a matter within its discretion in a different manner than an appellate court would in a similar circumstance does not demonstrate that an abuse of discretion has occurred. *Downer,* 701 S.W.2d at 241–42. Further, an abuse of discretion does not occur as long as some evidence of a substantive and probative character exists to support the trial court's decision. *DeVore,* 908 S.W.2d at 608.

■ In a trial to the court where no findings of fact or conclusions of law are filed, the trial court's judgment implies all findings of fact necessary to support it. *Pharo v. Chambers County,* 922 S.W.2d

945, 948 (Tex.1996). Where a reporter's record is filed, however, these implied findings are not conclusive, and an appellant may challenge them by raising both legal and factual sufficiency of the evidence issues. *Roberson v. Robinson,* 768 S.W.2d 280, 281 (Tex.1989). Where such issues are raised, the applicable standard of review is the same as that to be applied in the review of jury findings or a trial court's findings of fact. *Id.*

■ In determining a "no-evidence" issue, we are to consider only the evidence and inferences that tend to support the finding and disregard all evidence and inferences to the contrary. *Bradford v. Vento,* 48 S.W.3d 749, 754 (Tex.2001); *Cont'l Coffee Prods. Co. v. Cazarez,* 937 S.W.2d 444, 450 (Tex.1996); *In re King's Estate,* 150 Tex. 662, 244 S.W.2d 660, 661 (1951). Anything more than a scintilla of evidence is legally sufficient to support the finding. *Cazarez,* 937 S.W.2d at 450; *Leitch v. Hornsby,* 935 S.W.2d 114, 118 (Tex.1996). More than a scintilla of evidence exists if the evidence furnishes some reasonable basis for differing conclusions by reasonable minds about the existence of a vital fact. *Rocor Int'l, Inc. v. Nat'l Union Fire Ins. Co.,* 77 S.W.3d 253, 262 (Tex.2002).

■ Where the implied findings of fact are supported by the evidence, it is our duty to uphold the judgment on any theory of law applicable to the case. *Worford v. Stamper,* 801 S.W.2d 108, 109 (Tex.1990); *Point Lookout West, Inc. v. Whorton,* 742 S.W.2d 277, 278 (Tex.1987). We must uphold the judgment regardless of whether the trial court articulates the correct legal reason for the judgment. *See Harrington v. R.R. Comm'n,* 375 S.W.2d 892, 895 (Tex. 1964); *Dale,* 929 S.W.2d at 497–98.

## V.  APPLICATION OF LAW TO THE FACTS

During the trial on Appellees' application for a turnover order, Appellees called Appellant as an adverse witness and questioned her about the federal court's findings and her dealings with the money after she received it from Appellees. Additionally, Appellees offered expert witness testimony from CPA Gary Bishop and bankruptcy attorney St. Clair Newbern, III, who testified that Appellant could not establish her exemption claim. Appellees also offered twenty-nine exhibits from the federal trial, including a copy of the trial transcript and the final judgment. In support of her exemption claim, Appellant offered her own testimony, the testimony of her husband Cooke Leutwyler,[4] and the exhibits admitted during the federal trial.[5] Appellees argue that because the mistakenly paid funds do not belong to Appellant, she has no "right" to them and cannot claim that they are exempt as a "qualified rollover distribution under sections 31.002 and 42.0021. Appellees also argue that the evidence of Appellant's movement of the mistakenly paid funds in and out of various accounts, converting it to cash, and the expenditures for personal items—the extent of which was discovered only after the federal court had signed a final judgment—further frustrate the credibility of Appellant's exemption claims.

### A.  EVIDENCE ADMITTED DURING THE FEDERAL TRIAL

**4.** Cooke Leutwyler identified Defendant's Exhibit One as the couple's joint income tax return for 1998, which he signed and filed.

**5.** The exhibits consisted of Cooke Leutwyler and Appellant's 1998 federal income tax return, a letter to Appellant from Beverly Lotz, pension administration reports, an American Funds IRA application, an application and information concerning a Wells Fargo IRA plan, a new account confirmation from American Funds, and a Morgan Stanley Dean Witter IRA–2000 Adoption Agreement.

During the federal trial, Appellant offered a letter into evidence to her from Appellees, which stated that "[a]s a result of the [QDRO] on file and [her] election, lump sum distributions from the Fixed Plan and the Variable Plan, [were] available to [her]." In a document signed by Appellant, a Wells Fargo Bank representative, and an authorized representative of American Airlines, Inc., Appellant directed Appellees to distribute the taxable proceeds of her lump sum payments from her former husband's pension plans by wire transfer to a rollover IRA or other qualified retirement plan. After distributions of $167,445.67 and $390,601.34 were wired to her account at Wells Fargo Bank, she testified that the money was then wire transferred to an account at Securities of America, which Robert Gormly, Jr. ("Gormly") managed.

At the federal trial, Appellant did not dispute that Appellees had overpaid her because of an erroneous construction of the QDRO. Appellees offered the testimony of plan administrators Beverly Lotz and Diane Johnson as evidence of the amount Appellant equitably owed them as reimbursement. Johnson testified that under a correct reading of the QDRO, Appellees overpaid Appellant $401,834.08.

Appellant testified to gifts and expenditures she allegedly made with the money Appellees disbursed to her, but she testified that the benefits remained in one principal account, the Securities America IRA. During cross-examination, however, Appellees elicited evidence that Appellant withdrew $9,060 from the account managed by Gormly between May and December of 1998. Appellees also directed the court to Appellant's answers and supplemental answers to interrogatories as evidence of the withdrawals Appellant made in 1998 and 1999.

Based on this evidence, the federal court found that Appellant was overpaid $410,540.32 and that she had not suffered any detrimental reliance by reason of the overpayment. On July 23, 2001, the federal court signed a final judgment ordering that Appellees recover $410,540.32 plus interest from Appellant. After the federal court entered its final judgment, Appellees conducted further discovery in connection with their attempts to enforce and collect on the judgment.

### B. ADDITIONAL EVIDENCE DISCOVERED AFTER THE FEDERAL TRIAL

During this discovery period, Appellees learned that Appellant had transferred and converted funds from Appellees into cash before redepositing them in several bank accounts in the weeks preceding the federal trial. Appellant testified at the turnover proceeding that she deposited $558,039.01 in the Securities America account in 1998 and that in February and June of 2001, she withdrew money from that account and deposited it into another account at the First State Bank of Texas. Plaintiff's Exhibits Nos. Seven and Eleven are checks from Appellant's First State Bank account, signed by her, and made out to "Cash" in amounts of $144,560 and $316,000. Appellant admitted that she cashed these checks and put the currency in a safe in her home.[6] Further, Appellant acknowledged that to her knowledge neither she nor her lawyer had informed Appellees that she had more than $400,000 in cash at her home. Appellant conceded that the "money wasn't in an IRA [in June]," but she claimed that "it was still IRA money."

---

**6.** During her deposition, Appellant admitted that she placed almost $500,000 under her bed. Appellant testified at the turnover proceedings, however, that she placed the money in a safe at her house.

After the federal trial, Appellees filed a motion to set aside fraudulent transfers and for an injunction. Appellant testified at the turnover proceeding that, in response to Appellees' motion, she had filed a sworn declaration, in which she admitted that she had withdrawn a total of $463,128 from her accounts and deposited the funds in First State Bank of Texas. In her declaration, she also admitted that she paid back $202,000 into the Securities America account around July 19, 2001, that she rolled over $140,000 into an IRA at Morgan Stanley on July 20, 2001, and that she rolled over $57,000 into a Wells Fargo IRA on July 23, 2001. Appellant's declaration stated that $10,000 was redeposited in cash in the First State Bank account on July 12, 2001. Her federal declaration, however, never mentioned the conversion of the money to cash.

At the turnover proceeding, Appellant confirmed these transactions by admitting that, after the federal court entered an injunction prohibiting her from making any further withdrawals, she continued to maintain the three retirement accounts— the Gormly plan, the Wells Fargo plan, and the Morgan Stanley plan—funded with $558,000 from American Airlines and $16,000 from a previous marriage. Appellant insisted that she created these accounts for tax purposes and not to defraud any of her creditors. Appellant testified that she had filed a 1998 tax return with the IRS and that they had not audited that return. Appellant stated that the IRS had never "issued a notice . . . that the rollover was not into a qualified plan." [7]

Appellant, however, admitted that she understood the federal court determined that she had been mistakenly overpaid $410,540.32 by Appellees and that she was required to repay that sum. She further agreed that she never appealed the federal court's judgment. Finally, when asked whether she understood that the federal court's judgment was final and that she knew she was obligated to pay, she replied, "Yes."

## C. APPELLANT'S EXEMPTION ARGUMENT

■ Appellees argue that Appellant did not have a legal right to the pension funds that they mistakenly overpaid her. Appellees therefore contend that Appellant cannot claim a section 42.0021 exemption for the benefits because they do not belong to her. *See* TEX. PROP.CODE ANN. § 42.0021. We mentioned above that the first sentence of section 42.0021(a) establishes an exemption with respect to

a person's *right* to the assets held in or to receive payments, whether vested or not, under any stock bonus, pension, profit-sharing, or similar plan, including a retirement plan for self-employed individuals, and under any annuity or similar contract purchased with assets distributed from that type of plan, and under any retirement annuity or account described by Section 403(b) or 408A of the Internal Revenue Code of 1986, and under any individual retirement account or any individual retirement annuity, including a simplified employee pension plan.

TEX. PROP.CODE ANN. § 42.0021(a) (emphasis supplied).

---

**7.** We agree with the following statement from Appellees' brief:

[T]he IRS's treatment to date of [Appellant's] 1998 return cannot be taken as an imprimatur of the purported 'qualified' status of the Plan's mistaken distribution bene-

fits. Since the filing of [Appellant's] 1998 return, the IRS has not been made aware of the mistaken nature of the distribution and thereby afforded the necessary information to act on the tax consequences of this post-filing event.

Appellees offered evidence that they mistakenly overpaid Appellant. Appellant did not put forward any evidence to establish a right to the overpayments contained in the three accounts, which she claimed were exempt funds or proceeds of exempt funds. To the contrary, Appellant conceded that she knew the overpayment did not belong to her and that she was obligated to pay Appellees in accordance with the federal court's final judgment.

A party claiming an exemption under section 42.0021 bears the burden of proving that he or she is entitled to it. *See id.* § 42.0021; *Lozano v. Lozano,* 975 S.W.2d 63, 67 (Tex.App.-Houston [14th Dist.] 1998, pet. denied); *Dale,* 929 S.W.2d at 498–99; *Rucker v. Rucker,* 810 S.W.2d 793, 795–96 (Tex.App.-Houston [14th Dist.] 1991, writ denied). Appellant has not met this burden. Because "[a]n exemption is a right given by law to a debtor to retain a portion of his [or her] property free from the claims of creditors," we hold that Appellant cannot claim as exempt the portion of benefits to which she has no legal right. *Pickens v. Pickens,* 125 Tex. 410, 83 S.W.2d 951, 954 (1935); *see also In re Swift,* 124 B.R. 475, 481 (Bankr.W.D.Tex. 1991) (finding computer system that was not the property of the debtor could not be included in the debtor's exemptions); *Day,* 112 F.Supp.2d at 837–39 (holding plaintiff had no legal right to benefits erroneously distributed pursuant to a void QDRO).

Further, as Appellees argue, the funds mistakenly distributed to Appellant did not constitute an "amount[ ] qualifying as a nontaxble rollover contribution," which is a necessary component of the section 42.0021 exemption. *See* TEX. PROP.CODE ANN. § 42.0021(b). Because the amount received by Appellant was incorrectly cal-culated, the portion constituting the mistaken amount did not qualify as an eligible rollover distribution under section 402(c) of the Internal Revenue Code. 26 U.S.C.A. § 402(c)(4) (West Supp.2003) (describing eligible rollover distributions). Rather, the mistaken amount was an excess rollover contribution as defined by section 408(d)(5). *Id.* § 408(d)(5). The three accounts, which were comprised solely of excess rollover contributions, therefore did not qualify as IRAs under the terms of Internal Revenue Code section 408(a). *See* 26 U.S.C.A. § 408(a).[8]

Appellant directs us to *In re Youngblood* in support of her argument that only the IRS can determine that a plan is unqualified and that the trial court abused its discretion in ordering turnover relief in the absence of such a finding. 29 F.3d 225, 229 (5th Cir.1994). We find Appellant's reliance on *Youngblood* to be misplaced. Unlike *Youngblood,* in the case at bar, there is a final judgment from a federal court determining that the distributions from Appellees were made by mistake. Appellant never appealed this determination, and she admitted that she had been overpaid and was obligated to pay back the mistakenly paid funds to Appellees.

Based on the record before us, under the applicable standard of review, we hold that the trial court did not abuse its discretion in rejecting Appellant's exemption claims and in ordering turnover relief. *See* TEX. PROP.CODE ANN. § 42.0021; *Beaumont Bank,* 806 S.W.2d at 226; *DeVore,* 908 S.W.2d at 608. We therefore overrule Appellant's two issues.

## VI. APPELLATE ATTORNEYS' FEES

The trial court's turnover order provides that "[i]n the event of an

---

**8.** Section 408(a) of the Internal Revenue Code states that an IRA is a trust created in the United States for the exclusive benefit of an individual or his or her beneficiaries, which meets all of several requirements. 26 U.S.C.A. § 408(a).

appeal by [Appellant], in the Court of Appeals, if the appeal is successful, [Appellees] will further be entitled to $3,500.00 as reasonable attorneys' fees." Appellees have requested that we affirm the conditional award of these appellate attorneys' fees. It is well-settled that the trial court's award of attorneys' fees may include appellate attorneys' fees. *Neal v. SMC Corp.,* 99 S.W.3d 813, 818 (Tex.App.-Dallas 2003, no pet.) (citing *Siegler v. Williams,* 658 S.W.2d 236, 241 (Tex.App.-Houston [1st Dist.] 1983, no writ)). To support the award of appellate attorneys' fees, there must be evidence of the reasonableness of the fees pertaining to the appellate work, and the trial court must condition the award of attorneys' fees to an appellee upon the appellant's unsuccessful appeal. *Id.* We hold that Appellees are entitled to $3,500 for appellate attorneys' fees. *See id.*

### VII. CONCLUSION

Having overruled both of Appellant's issues and having addressed Appellees' requested appellate attorneys' fees, we affirm the trial court's judgment.